Appeal No. 22-1287

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EASTERN DISTRICT OF VIRGINIA

---

PETER J. MASSARO,

*Appellant*,

v.

FAIRFAX COUNTY,

*Appellee*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

---

## BRIEF OF APPELLANT PETER J. MASSARO

---

* Daniel S. Crowley, Bar No. 989874
HANNON LAW GROUP, LLP
1800 M Street N.W., Suite 850 S
Washington, D.C. 20036
Tel: (202) 232-1907
dcrowley@hannonlawgroup.com

*Attorneys for Appellant Peter J. Massaro*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................... i

TABLE OF AUTHORITIES ........................................................... iii

STATEMENT OF JURISDICTION .................................................. 1

STATEMENT OF THE ISSUES ..................................................... 1

STATEMENT OF THE CASE ......................................................... 2

SUMMARY OF THE ARGUMENT ............................................... 22

STANDARD OF REVIEW ............................................................ 23

ARGUMENT ................................................................................ 24

    I.     LEGAL STANDARDS .................................................... 24

         A.    Massaro's Three Retaliation Claims are Evaluated Under the Same Framework. ........................................................ 24

         B.    Two Ways to Prove Retaliation. ............................... 25

         C.    Proving the Causation Element ................................ 26

    III.   THE DISTRICT COURT ERRED IN FINDING INSUFFICIENT EVIDENCE OF CAUSATION ......................................... 29

         A.    Statements by Major Cleveland Demonstrating Continuing Animus and Retaliation at First Opportunity ............................ 29

         B.    Interference by Majors Cleveland and Owens in the Investigation Shows Retaliatory Intent and Retaliation at First Opportunity. ............................ 32

         C.    Initial Actions Taken Against Massaro Showed Intervening Antagonism and Inconsistent Explanations. ............................ 35

         D.    The Department's Inconsistent and Pretextual Justifications for the Discipline. ............................ 37

CONCLUSION ......................................................................................41

ADDENDUM: UNPUBLISHED DECISIONS ......................................................44

## TABLE OF AUTHORITIES

**Cases**

*Bostic v. Schaefer,* 760 F.3d 352 (4th Cir. 2014)......................................................23

*Burgess v. Bowen*, 466 F. App'x 272 (4th Cir. 2012) ............................................26

*Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52 (4th Cir. 1994).............24

*Connick v. Myers*, 461 U.S. 138 (1983)...................................................................25

*Evans v. Int'l Paper Co.*, 936 F.3d 183 (4th Cir. 2019) .........................................24

Farrell v. Planters Lifesavers Co., 206 F.3d 271 (3d Cir. 2000) ............................28

*Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243 (4th Cir. 2015).... 23, 25, 27, 30, 31, 36

*Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208 (4th Cir. 2016) ....................26

*Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277 (4th Cir. 2004)........26

*Hinton v. Virginia Union Univ.*, 185 F. Supp. 3d 807 (E.D. Va. 2016) 25, 28, 31, 32

*Hitachi Credit Am. Corp. v. Signet Bank,* 166 F.3d 614 (4th Cir. 1999) ...............23

*Holland v. Washington Homes, Inc.*, 487 F.3d 208 (4th Cir. 2007)................. 26, 38

*Kirby v. City Of Elizabeth City, North Carolina*, 388 F.3d 440 (4th Cir. 2004).....25

*Lettieri v. Equant, Inc.,* 478 F.3d 640 (4th Cir. 2007) ................................ 27, 28, 31

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)......................................25

*McMillian v. King & Queen County Sch. Bd.*, No. 3:20CV271, 2020 WL 5552118 (E.D. Va. Sept. 16, 2020) ............................................................................... 28, 31

*Mohammed v. Cent. Driving Mini Storage, Inc.*, 128 F. Supp. 3d 932 (E.D. Va. 2015) .......................................................................... 27, 28, 40, 41

*Perkins v. Int'l Paper Co.*, 936 F.3d 196 (4th Cir. 2019) ........................................23

*Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000) ..........................26

*Roberts v. Glenn Indus. Group, Inc.*, 998 F.3d 111 (4th Cir. 2021) ................ 25, 26

*St. Paul Fire & Marine Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 365 F.3d 263 (4th Cir. 2004) ..............................................................................23

*Strothers v. City of Laurel, Maryland*, 895 F.3d 317 (4th Cir. 2018) ....................27

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)..................................26

*Tolan v. Cotton*, 572 U.S. 650 (2014)......................................................................34

*Tyler v. Univ. of Arkansas Bd. of Trustees*, 628 F.3d 980 (8th Cir. 2011) ..............25

*Ullrich v. CEXEC, Inc.*, 233 F. Supp. 3d 515 (E.D. Va. 2017) ...............................25

*Willis v. City of Virginia Beach*, 90 F. Supp. 3d 597 (E.D. Va. 2015)....... 28, 32, 35

*Wilson v. City of Gaithersburg*, 121 F. Supp. 3d 478 (D. Md. 2015) .....................27

**Statutes**

29 U.S.C. § 621 .......................................................................................................19

29 U.S.C. § 623 .......................................................................................................24

42 U.S.C. § 1983 ........................................................................................ 20, 24, 25

42 U.S.C. § 2000e ........................................................................................... 19, 24

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Appellant's claims arise under the laws of the United States. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 as this is an appeal from a final order of the United States District Court for the Eastern District of Virginia that disposed of all parties' claims.

This appeal is timely under Rule 4(A)(1)(a) of the Federal Rules of Appellate Procedure as the district court entered the order on February 15, 2022 and Appellant filed the notice of appeal on March 15, 2022.

## STATEMENT OF THE ISSUES

Whether the district court erred in holding that no reasonable juror could find a causal relationship between Massaro's protected activity and the adverse actions taken against him.

## STATEMENT OF THE CASE

Plaintiff Peter J. Massaro, now retired, was a highly decorated police officer with the Fairfax County Police Department. Massaro graduated from Georgetown University with a bachelor's degree in criminal justice. JA0023-24. While there, he enlisted in the United States Marine Corps' officer training program. *Id*. He went on to command an infantry company in the First Gulf War and earned numerous commendations, including the Combat Action Ribbon and Navy Achievement Medal with Valor. *Id*. He was honorably discharged at the rank of Major. *Id*.

Massaro joined the Fairfax County Police Department in 1996. JA2218. He was promoted to Sergeant in 2011 and then to Second Lieutenant in 2015. JA2218-19. Throughout his tenure, Massaro supervised patrol units, training units, and specialty units, including the SWAT Team. JA0023; JA0089-94. The Department named him Supervisor of the Year in 2018, awarded him the Bronze Medal of Valor in 2018, and awarded him the Department's highest honor, the Gold Medal of Valor in 2019. JA0009; JA0023; JA1692-93; JA1821; JA1844-45.

The Department thought so highly of Massaro that in February 2018, when it needed a new supervisor of the Firearms Range, it went outside the normal competitive assignment process and placed Massaro in that role. JA1091-93. This was a prestigious assignment that few officers are qualified to hold. *Id*.; JA0009.

He was responsible for firearms training for the entire Police Department, the

Fairfax County Sheriff's Department, and the police departments for the towns of

Vienna and Herndon.  JA0009; JA0571-72.

**Chief Roessler**

Edwin C. Roessler, Jr., served as Chief of Police for the Fairfax County

Police Department from 2013 until he retired in 2021.  JA1736.  Chief Roessler

identified increasing the diversity of the Police Department as one of his top

priorities.  JA1744; JA1851.  On his first day as Chief, he created the Council on

Diversity Recruitment with the goal of making the Department as diverse as the

community it serves.  *Id*.; JA0072-77.

**2017 First Lieutenant Promotion Process**

Fairfax County employs a competitive promotion process for First

Lieutenants.  JA1737; JA1758.  The county's Department of Human Resources

("DHR") administers a test that includes written and verbal exercises, scored on a

numerical scale.  *Id*.  It then produces a promotion list that identifies the top

performers as "highly qualified," others who pass the test as "qualified," and those

who fail as "not qualified."  JA1738-40; JA1760; JA1901-02.  According to Chief

Roessler, there is a "firewall" between him and HR in the creation of the

promotion list.  *Id*.; JA1737.

3

The Department is limited in the number of First Lieutenants that it can have. JA1742-43. If First Lieutenants are promoted, retire, or otherwise leave the Department, the Chief may select candidates from the promotion list to fill the vacancy. *Id*. The only requirement is that he must first pick from the pool of candidates scored as "highly qualified." *Id*.; JA1760. Once that pool is exhausted, he can choose from the "qualified" candidates. *Id*. The promotion list was not made available to the candidates or other officers.

In 2017, 66 candidates, including Massaro, tested for promotion to First Lieutenant. JA1901-02. That December, DHR provided Roessler a promotion list based on the candidates' test scores. *Id*. DHR identified 36 officers were "highly qualified" for promotion, 27 were "qualified," and 3 were "not qualified." *Id*.

When Roessler received the list, he asked DHR to change it. JA1831; JA1904. Instead of the required banding, Roessler asked for a list showing everyone who "passed" the test as "qualified," eliminating any distinction between the "highly qualified" and "qualified" candidates. *Id*.; JA1754-66. DHR complied and provided a list showing 63 officers identified as "qualified" and three as "not qualified." JA1903. This allowed Roessler to promote anyone who passed the test, regardless of their comparative qualifications.

On September 20, 2018, Roessler promoted four candidates to First Lieutenant: Marisa Kuhar, Wilson Lee, Mohammed Oluwa, and Dana Robinson.

JA1905.  On DHR's original promotion list, Oluwa, an African-American male, and Robinson, a Caucasian female, were identified as "qualified" but not "highly qualified."  JA1770; JA1901.  In other words, Roessler's request that DHR modify the list enabled him to select these candidates even though DHR determined that they were less qualified.[1]

**Massaro's Discrimination Complaint**

Throughout the Department, there was widespread belief that Chief Roessler promoted candidates based on race, gender, and age, in violation of county regulations and federal law.  JA0269-73; JA1619-1621; JA1777-78; JA1996.  As Major Robert Blakely explained, the vast majority of candidates for promotion were Caucasian men, yet Roessler typically promoted a higher proportion of female and minority officers.  JA0269-73.

Massaro was among those who long-believed Roessler discriminated in the promotion process, but never believed he could prove it.  That changed with the promotion of Marisa Kuhar in September 2018.  JA1905.  To be eligible for promotion to First Lieutenant, candidates had to possess a certain number of college credits and Massaro knew Kuhar did not.  JA1771-73.

---

[1]    The Department used each promotion list for two years.  JA1758.  All promotions based on the 2017 list were considered part of the 2017 promotion cycle, even if they occurred in later years.

On September 26, 2018, Massaro filed a complaint of discrimination against the Department.  JA0065.  He alleged that he was the most qualified candidate but was not selected because of his gender.  *Id*.  As evidence, he cited Roessler's promotion of Kuhar, an unqualified female officer, instead of him.  *Id*.  The complaint was investigated concurrently and independently by the Department's Internal Affairs Bureau and the county's Office of Human Relations and Equity Programs ("OHREP").  JA1354-55.  Massaro later amended his complaint to add claims of discrimination based on race and age.  JA0068.

Two days later, Roessler deferred Kuhar's promotion.  JA0070.  Rather than correctly viewing this as an admission that the Police Department promoted a less-qualified female over Massaro, OHREP dismissed the complaint as moot.  JA1354.  Months later, IAB did the same.  JA1357.

On October 7, 2018, Massaro filed a Charge of Discrimination with the Equal Employment Opportunity Commission alleging that his non-promotion was due to his race, age, and gender.  JA1536-66.

**Roessler Installs Major Cleveland as Director of Criminal Justice Academy**

Following Massaro's discrimination complaint, Chief Roessler announced that Major Paul Cleveland would replace Major Anthony Matos as the next Director of the Criminal Justice Academy, which oversaw the Firearms Range.

JA0570-71.  According to Cleveland, Roessler chose him due to his reputation as someone who could "fix" difficult situations.  JA0661-62.

Massaro's first meeting with Cleveland took place on May 6, 2019, to discuss filling vacancies at the Firearms Range.  JA1178-86; JA1632-33. Cleveland had not yet moved into the new position, but his transfer was imminent. JA0998.  Also present were Massaro's first- and second-line supervisors, First Lieutenant Jeffrey Reiff, and Captain Jeffrey Powell.  JA1178-86; JA1632-33.  As the meeting progressed, it became clear to Massaro and Reiff that Cleveland sought to install his own people, rather than those Massaro and Reiff had selected. JA1178-86; JA1636-42.

Cleveland then told Massaro and his supervisors that the range was under scrutiny from Chief Roessler.  JA1645-50.  When Reiff and Massaro asked why, Cleveland gave several reasons that they found unpersuasive.  *Id*.  When they pressed for a better explanation, Cleveland said, "[w]ell[,] Pete[,] it didn't help [that] you filed a complaint against the Chief[.]"  JA1187-89; JA1653-54.  Massaro asked if Cleveland came to the range with "marching orders" from Chief Roessler, to which Cleveland replied that he was "sent here with a clean slate, and you're still here, Pete."  JA1187-89; JA1649-59; JA1992.  Cleveland repeated that line twice, which Reiff and Massaro understood as a threat that Massaro should be careful.  JA1659-62; JA1992.  Reiff quickly moved to end the meeting and

7

afterwards warned Massaro that "cross hairs were on him and he better watch his ass." JA1662-65. Reiff was so concerned that he later wrote down everything he could remember from the meeting. JA1990-92.

**Massaro's Conversation with LaBarca**

Just a few weeks after issuing this warning, Cleveland initiated investigations of Massaro by both IAB and OHREP. On May 22, 2019, First Lieutenant Lorianne LaBarca met Massaro in his office. JA1543. LaBarca had taken the First Lieutenant's exam with Massaro and was one of the female officers Roessler promoted over him. JA1903. LaBarca testified that she went into this meeting with a poor opinion of Massaro, and that she did not value his opinion on her career or anything else. JA0975-81.

Nevertheless, she confided in Massaro that she was uncertain about whether she was prepared for her new assignment. JA0981; JA1406-11; JA1543. The Department favored variety of experience over specialization, and LaBarca was now Commander of the Special Operations Division, even though she had never served in any of its units. JA0930; JA1407-08. She also said the Department wanted to highlight her promotion on social media. JA0983-86; JA1418-19. LaBarca shared with Massaro that she was concerned this would make it appear as if she received the promotion because of her gender, making it more difficult to earn the respect of her new subordinates. JA0983-86.

In response, Massaro said the Department has made a point of promoting female and minority officers, the subject of his EEO complaint, and that the Department was likely trying to highlight those efforts. JA1418-19; JA2230-31. LaBarca then asked Massaro if he thought she was promoted because of her gender. JA1409-10. Massaro told the truth: he believed her gender was a factor in the Chief's decision to promote her. *Id*. This angered LaBarca, who called Massaro an "asshole" and then left. *Id*.

Later that day, LaBarca decided to report her interaction with Massaro to Major Cleveland. JA0994. Cleveland was not yet Massaro's supervisor, and was outside LaBarca's own chain of command. JA0994-98. She said she went to Cleveland because she thought he was more likely to act against Massaro than Major Matos, who still encumbered the position. *Id*. LaBarca said she never considered going to IAB, and simply expected Cleveland to talk to Massaro. JA0994.

Instead, Cleveland—who just days earlier had warned Massaro that his discrimination complaints invited scrutiny by Chief Roessler—reported Massaro to IAB and OHREP. JA0640-41; JA0670-71; JA0994. He claimed to view Massaro's statement to LaBarca that the Chief promoted her because of her gender as creating a hostile work environment. *Id*. This made no sense: LaBarca out-ranked Massaro, was outside his chain of command, and had no regular interaction

9

with him.  JA1413.  Nevertheless, Cleveland escorted LaBarca to IAB, and then to

OHREP, to make a complaint.  JA0640-41; JA0670-71; JA0994.

**IAB Investigation**

Second Lieutenant Andrew Hirshey was assigned to investigate the

complaint for IAB.  JA0770.  According to Hirshey, the investigation was unusual

from the very beginning.  JA0770-75.  He would normally receive a complaint,

review relevant documents, and spend time preparing for an interview.  *Id*.  But in

this case, the IAB Commander, Major Matthew Owens, told him to interview

LaBarca and Massaro on the spot.  *Id*.  Hirshey said that never happened before or

since.  *Id*.  He thought Roessler and his command staff were using this

investigation to "get rid" of Massaro because of his discrimination complaint.

JA0828-29.

Major Cleveland also personally interfered with the investigation.  He

watched the interview and discussed it with Hirshey's supervisors, who then

advised Hirshey on how to question Massaro.  JA0649-53; JA0684-85.  Hirshey

interviewed Massaro twice, on consecutive days.  JA0805-06.  In both interviews,

Massaro admitted that he said Roessler promoted LaBarca based on her gender.

JA1395; JA1409.  When pressed by Hirshey to explain why he thought so,

Massaro said it was based on his past experiences with LaBarca and his own

assessment of her performance.  JA1441-44.

At the end of the second interview, Cleveland walked into the interview room and sat down with Massaro. JA0701-10; JA1210-13. Cleveland said to Massaro, "my resume is as good as yours" and "I think that Loriann LaBarca makes a fine commander. What do you think about that?" JA1210-13. Massaro took this as an attempt to intimidate him and as a sign that the Department was retaliating against him. *Id*. Although the video recording of the incident shows this meeting, the audio is inexplicably cut. JA0866-68. According to Hirshey, it could only be muted from the computer in the room where Cleveland had been watching. *Id*.; JA0649-53; JA0684-85.

At the conclusion of the second interview, Massaro was relieved of duty. JA0501. To justify the decision, Major Owens claimed there were "some discrepancies and inconsistencies arising in regards to Second Lieutenant Massaro's statements." JA1921. This was not true. Both Hirshey and Roessler admitted that Massaro told the truth during both interviews. JA0806-07; JA1838.

Chief Roessler did not have the authority to keep Massaro on extended leave. JA1922. On May 29, 2019, he submitted a request to the County Executive for permission to extend Massaro's administrative leave until the investigation was complete. *Id*. To justify keeping Massaro out of work, Roessler told the County Executive that the allegations "if found to be sustained, would result in termination." *Id*. The County Executive approved the request and Massaro lost his

11

job title, his supervisory responsibilities, overtime opportunities, and was

disqualified from promotion.  Although Hirshey completed the investigation in

September 2019, Chief Roessler did not return Massaro to duty for another six

months.  JA1980.  Roessler also ordered Massaro to submit to a mental health

examination.  JA1793-94.

**Major Cleveland Tells Others that Massaro had a Target on His Back**

Around this time, Major Cleveland told three detectives that Massaro had a

"target on his back" due to his prior complaints against the chief.  JA1997;

JA2014-15.  As Detective Justin LaScola recounted, Cleveland said that Massaro

> made a comment to a female, and he should have known better.  Be-
> cause of the promotion complaints, he's had a target on his back.  From
> that, I remember just kind of like in awe looking at my colleague.  And
> I think he either observed our faces or realized what he said.  And goes,
> "Not that you can't make a complaint.  That's not what I'm saying."
> And then shortly after, the conversation just pretty much ended.  And I
> remember coming upstairs, and I just couldn't believe what he had
> stated in reference to a target being on an individual's back to subordi-
> nates like us, to a supervisor above us, and that he's a commander.

JA1997.  Both he and Detective Bradley Guckenberger understood Major

Cleveland to mean that Roessler was targeting Massaro in retaliation for filing a

discrimination complaint.  JA1997; JA2014-15.

**Investigation Results**

OHREP concluded its investigation on July 22, 2019.  JA0093.  It found the

allegation of discrimination "not substantiated."  *Id.*  Two months later, Hirshey

reached a similar conclusion.  JA0838.  He determined that Massaro did not violate

any anti-discrimination policy, but that he violated Department Regulation 201.13,

which requires employees to treat others "with respect, courtesy, and tact."  *Id.*

When Hirshey presented his draft conclusions, Major Owens told him to add

a charge for "unlawful discrimination" under Department Regulation 201.14.

JA0838-39.  Hirshey said he believes Owens did so because of Massaro's

discrimination complaints against the chief.  JA0842-43.  Hirshey did as he was

told and issued a report on September 26, 2019, sustaining two violations:

unlawful discrimination and failure to display tact.  JA0926-36.

**Captain Wall's Recommendation**

Under Department policy, the IAB report was to be referred to the officer's

commander for consideration of discipline.  JA0278-80; JA0702-05.  However,

because Major Cleveland interfered with the investigation, he was disqualified.  *Id.*

Instead, the review was assigned to Captain Michael Wall.  *Id.*

Captain Wall held a disciplinary hearing to decide whether Massaro should

be punished.  JA0154-55.  After hearing from witnesses, Wall found that Massaro

did not act with malicious intent and that his comment about gender and

13

promotions was not "completely out of context" of the discussion. JA0160-61.

Wall recognized that discriminatory promotions was a "widely discussed topic"

and that Massaro's belief was informed by "recent promotional trends" within the

Department. *Id.*

Wall did not sustain the discrimination charge but he did find that Massaro

failed to display "tact." He said "it is not respectful or tactful to tell a female

employee that her promotion was based on her gender." JA0161. Wall said

Massaro was free to complain about discrimination in general, but that it was

inappropriate for him to make that comment with respect to LaBarca individually,

because he did not know "what factors may have played a role in her promotion."

*Id*.

**Major Blakley's Recommendation**

Massaro appealed Captain Wall's recommendation to Major Blakely. Major

Blakely then issued a recommendation to Chief Roessler. JA0545. Although the

charge only required him to consider whether Massaro treated LaBarca "with

respect, courtesy, and tact," his report focused entirely on whether Roessler

engaged in discrimination. JA0547-49. Blakley wrote that Massaro's "opinion

about Lieutenant LaBarca's promotion were recklessly made inasmuch as [he] had

no knowledge of the factors or criteria that went into the decision to promote her."

JA0547.  He said Massaro had no evidence to support his opinion,[2] and then

defended Roessler's decisions as non-discriminatory:

> The Chief of Police makes all selections for promotion and I have seen
> no evidence that you were provided an explanation by the Chief on
> what criteria he used when considering Lieutenant LaBarca's promo-
> tion . . . Despite not having any personal knowledge with regard to
> Lieutenant LaBarca's promotion, you concluded that gender was a '*ma-
> jor factor*' for her promotion . . . Your opinion that Lieutenant
> LaBarca's gender was a '*major factor*' in her promotion is incorrect
> and offensive.

*Id*.

It made no sense for Major Blakely to address this at all; Massaro had

essentially been charged with being rude.  When asked why it mattered whether

Massaro was correct about the chief's promotional decisions, he said Massaro has

the "right to belie[ve]" that Roessler promoted LaBarca because of her gender, but

that he "doesn't have the right to espouse that, certainly to her, or anyone else in

the department."  JA0359-61.  Blakely said that even though many officers believe

Roessler's promotions are discriminatory, "it doesn't mean that any of them are

---

[2]      Despite claiming there was no evidence of discrimination, Major
Blakely volunteered that when he was promoted, "60-something percent of those
who were promoted in the command promotions were, you know, in diverse
categories whereas, you know, the lists only contained, you know, a small
percentile.  Because if you look at our diversity scorecard, it's factual data that you
can look at . . . And the data didn't add up, because we're 85 percent, you know,
white male."  JA0272-73.  "But I, you know, never engage in those conversations
because it doesn't do you any good, number one; and, number two, I don't know
why people got promoted."  *Id*.

right[.]" *Id*. Tellingly, Blakely said that if the allegation was true "that would

perhaps of changed some things." JA0364-65. But since he did not agree with

Massaro's claim of discrimination, he not only kept the one-day suspension that

Captain Wall recommended but added a disciplinary transfer. JA0549.

**Hearing Panel Finds in Favor of Massaro**

Massaro appealed Major Blakley's recommendation and requested a review

by an impartial hearing panel. Under Department regulations, the employee and

the Chief would each select one panel member, and those two members would

select a third. JA1800-05. Roessler chose First Lieutenant Rachel Levy, one of

the female officers he recently promoted over Massaro. *Id*.

Following an evidentiary hearing, two panel members issued the report of

the hearing panel. JA1939. They concluded that there was insufficient evidence to

sustain the charge. JA1941.

Roessler's representative, Lt. Levy, issued a dissenting opinion. JA1954-57.

Like Blakely, Levy disputed whether the process *from which she was promoted*

over Massaro was in fact discriminatory. *Id*. She recommended that Chief

Roessler sustain the charge, but did not think Massaro's behavior made him a

liability at the Firearms Range. *Id*. She said Massaro's "comments were isolated

in duration and nature," that he "has no record of making comments to recruits or

trainees and has twice been assigned to the Criminal Justice Academy." *Id*.  She recommended against a disciplinary transfer.  *Id*.

**Chief Roessler's Decision**

On March 12, 2020, Chief Roessler issued his "Response to Findings of Hearing Panel."  JA1963-65.  He wrote that he "disagreed with the findings of the Hearing Panel," but did not explain why.  *Id*.  Instead, he said he was punishing Massaro for two reasons: (1) "While on duty you made unprofessional remarks to another employee which involved gender and degrading statements about this person's integrity as a commander," and (2) "You made statements regarding the suitability of the other employee's assignment to the Special Operations Division based on gender."  *Id*.  Roessler then issued a written reprimand and imposed a disciplinary transfer to the Patrol Bureau.  JA1967; JA1980.

The brief explanation Roessler provided was false.  It is undisputed that Massaro did not make any degrading statements to LaBarca about her integrity or about her suitability to serve as Commander of the Special Operations Division.  JA0916-JA1060; JA1860-62.  He only commented about LaBarca's qualifications for that assignment during the compelled IAB interview.  *Id*.  Roessler was adamant during his deposition that his decision was based solely on the conversation between Massaro and LaBarca and even said that it would be unfair to punish Massaro for his compelled answers to Hirshey's questions.  JA1861-62.

17

Roessler admitted that his decision had nothing to do with any "degrading statements" about LaBarca's "integrity as a commander," or her suitability for her assignment. *Id*.

During his deposition, Chief Roessler was asked to explain his rationale. JA1812-15. Like Major Blakely and Lt. Levy, Roessler disputed the accuracy of Massaro's claim of discrimination. When asked why that was relevant to his finding that Massaro failed to display "tact," Roessler admitted his true motivation: Massaro's accusation of discrimination. JA1813-15. He said that Massaro "*accus[ed] me of doing things I have not done,*" *i.e.*, promoting officers based on their gender. *Id*. This was a direct admission by Roessler that he disciplined Massaro for complaining of discrimination.

Massaro appealed Chief Roessler's decision to the County Executive. That appeal was denied on May 27, 2020. JA1988. Upon Massaro's transfer to the Patrol Bureau, he was assigned to the least desirable shift: midnight to 8 a.m. JA0402-03; JA1278-79. Lt. Kuhar—the female officer whose promotion was deferred because of Massaro's September 2018 complaint—was then assigned as Commander of the Patrol Bureau. JA0406-07. This made Kuhar Massaro's second-line supervisor.

**Massaro's Retaliation Complaint**

After OHREP dismissed LaBarca's complaint for hostile work environment, but before the hearing with Captain Wall, Massaro filed a charge of discrimination with the Equal Employment Opportunity Commission. JA1536. Massaro accused the Department of retaliating against him for his earlier complaints by launching a baseless investigation, relieving him of duty, and refusing to return him to his position as the supervisor at the Firearms Range. *Id*. Massaro later amended his charge to include Captain Wall's decision and Chief Roessler's decision. JA1549; JA1564. He never received a decision from the EEOC.

**Procedural History**

On August 14, 2020, Massaro filed a complaint against Fairfax County in the United States District Court for the Eastern District of Virginia. Compl., Aug. 14, 2020 (ECF No. 1). Massaro brought three claims alleging that the Department retaliated against him for filing a complaint about discrimination in the promotion process. Count I alleged retaliation for complaining of discrimination based on gender and race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. JA0015. Count II alleged retaliation for complaining of discrimination based on age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621. JA0016. Count III alleged retaliation for exercising his First

Amendment right by complaining about discrimination, in violation of 42 U.S.C. § 1983.  JA0018.

After discovery, both parties moved for summary judgment.  Massaro argued that Chief Roessler's admission that he punished Massaro for accusing him of discrimination during his conversation with LaBarca was direct evidence of retaliation.  Massaro Mem. Summ. J., July 9, 2021 (ECF No. 35), at 19-29.  Based on this, as well as the deposition testimony of Cleveland, Hirshey, and Blakely, Massaro argued that no reasonable juror could find that the discipline was not retaliatory.  *Id*.

To avoid the consequences of this testimony, Fairfax offered a narrower interpretation of Massaro's complaint.  Fairfax Mem. Summ. J., July 2, 2021 (ECF No. 32), at 17-22.  It argued that Massaro only pled retaliation for filing a formal EEO complaint in September 2018 and that any evidence of retaliation for accusing Roessler of discrimination while talking to LaBarca was irrelevant.  *Id*. Fairfax then argued that there was no temporal connection between the September 2018 complaint and the disciplinary action.  *Id*.

On February 15, 2022, The Honorable T.S. Ellis, III, granted summary judgment on all counts to Fairfax County.  JA2372.  In a memorandum opinion, the district court said that Massaro's argument that "his statements to LaBarca in May 2019 also qualify as protected activity" was precluded by his complaint,

20

which only alleged that he engaged in a protected activity by filing an EEO complaint in September 2018. JA2363-64. "[T]herefore the only protected activity properly considered in resolving the summary judgment motions is Massaro's September 26, 2018 complaint that a less qualified candidate was promoted instead of Massaro." *Id*.

Proceeding on that basis, the district court acknowledged that the first two elements of retaliation—participation in a protected activity and suffering an adverse action—were not disputed, but that Massaro could not establish causation. JA2364. The district court said the "record discloses no connection between Massaro's September 2018 complaint and the May 2019 investigation and disciplinary action." JA2367. Instead, the district court found that the discipline resulted from the conversation with LaBarca. *Id*. In the absence of direct evidence, the district court also found the time lapse between the September 2018 complaint and the May 2019 investigation too great to infer causation. JA2367-68. For this reason, the district court entered summary judgment in favor of Fairfax on all counts.

## SUMMARY OF THE ARGUMENT

Lt. Massaro was a decorated officer who shared in the belief, widely-held among Fairfax County police officers, that Chief Roessler made promotion decisions based on age, race, and gender. When he was passed over for promotion in September 2018, he finally decided to file a formal complaint of discrimination. The retaliation did not commence immediately, as Massaro's commander was supportive of him and had a poor relationship with Roessler. But in early 2019, Roessler installed a new commander, and the retaliation began.

The evidence of the Department's retaliatory motive is unusually strong. Four different witnesses testified that the commander who initiated the investigation said the chief was targeting Massaro because of his complaint. The IAB investigator said he was rushed and pushed to a certain conclusion because the Department wanted to "get rid of Pete." The deciding official originally gave two reasons for the discipline, and in litigation, Fairfax added two more. But during his deposition, the deciding official admitted that none of those reasons were true and that he really punished Massaro for accusing him of discrimination.

Despite all of this, the district court granted summary judgment to Fairfax on all counts. It arrived at that outcome by ignoring some of the most important evidence and dismissing other evidence as "disputed," "not material," or "unrelated" to Massaro's complaint. In doing so, the district court repeatedly

22

failed to apply basic summary judgment principles that required it to view the evidence in the light most favorable to the non-moving party, and prohibited the court from weighing the evidence and making credibility determinations.

## STANDARD OF REVIEW

This Court reviews the district court's "grant of summary judgment *de novo,* affirming 'only if there are no material facts in dispute and the moving party is entitled to judgment as a matter of law.'" *St. Paul Fire & Marine Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 365 F.3d 263, 267 (4th Cir. 2004) (quoting *Hitachi Credit Am. Corp. v. Signet Bank,* 166 F.3d 614, 623 (4th Cir. 1999)). "'A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party.'" *Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (quoting *Bostic v. Schaefer,* 760 F.3d 352, 370 (4th Cir. 2014)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id*.

The Court is "required to view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party." *Foster*, 787 F.3d at 248. In doing so, it may "not weigh evidence or make credibility determinations." *Id. Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019). The court should only affirm summary judgment if "the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes

23

affirmatively that the adverse party cannot prevail under any circumstances."

*Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994).

## ARGUMENT

The district court erred in holding that "the record discloses no connection between Massaro's September 2018 complaint and the May 2019 investigation and disciplinary action." JA2367. To the contrary, Massaro presented substantial evidence demonstrating that Chief Roessler and his command staff retaliated against him at the first opportunity. When viewing that evidence in the light most favorable to Massaro, it is clear that the district court's order awarding summary judgment to Fairfax County was improper.

## I.    LEGAL STANDARDS.

### A.    Massaro's Three Retaliation Claims are Evaluated Under the Same Framework.

The three counts in Massaro's complaint have much in common. Title VII of the Civil Rights Act of 1964 prohibits an employer from retaliating against an employee for opposing certain forms of discrimination in the workplace, including race and gender. 42 U.S.C. § 2000e-3; *Evans v. Int'l Paper Co.*, 936 F.3d 183, 194 (4th Cir. 2019). The Age Discrimination in Employment Act prohibits retaliation for opposing age discrimination. 29 U.S.C. § 623(d). Section 1983 provides a private right of action to redress constitutional violations by municipalities, including retaliation for exercising First Amendment Rights. 42 U.S.C. § 1983.

All three claims are analyzed under the same framework.  *Tyler v. Univ. of Arkansas Bd. of Trustees*, 628 F.3d 980, 986 (8th Cir. 2011) (claims for retaliation under § 1983 "are analyzed under the same framework as claims of retaliation under Title VII"); *Ullrich v. CEXEC, Inc.*, 233 F. Supp. 3d 515, 532 (E.D. Va. 2017) ("elements of an ADEA retaliation claim are the same as a Title VII retaliation claim").  The only difference is that under § 1983, the complaint must also pertain to a matter of public, rather than private, concern.  *Kirby v. City of Elizabeth City, North Carolina*, 388 F.3d 440, 446 (4th Cir. 2004) (citing *Connick v. Myers*, 461 U.S. 138, 146 (1983)).

## B.    Two Ways to Prove Retaliation.

There are two methods of proving retaliation: through "direct and indirect evidence of retaliatory animus, or through the burden-shifting framework of *McDonnell Douglas Corp.*"  *Foster,* 787 F.3d at 249 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  *See Roberts v. Glenn Indus. Group, Inc.*, 998 F.3d 111, 122 (4th Cir. 2021).  The first method may include "statements by an employee's supervisors that are generally discriminatory or statements by supervisors that indicate that their actions were motivated by the employee's race or sex, or in retaliation against filed EEOC claims."  *Hinton v. Virginia Union Univ.*, 185 F. Supp. 3d 807, 817 (E.D. Va. 2016).

In the absence of such evidence, a plaintiff can use the burden shifting approach. To establish "a *prima facie* case of retaliation" under *McDonnell Douglas,* the plaintiff "must show that: (1) he engaged in a protected activity; (2) the employer acted adversely against him; and (3) the protected activity was causally connected to the adverse action." *Holland v. Washington Homes, Inc.*, 487 F.3d 208 (4th Cir. 2007). The burden then shifts to the employer to articulate a non-retaliatory reason for the adverse action. *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–56 (1981)). It then "shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000)).

## C.    Proving the Causation Element.

Judge Ellis found that Massaro easily satisfied the first two elements of the *prima facie* case but failed to demonstrate the third—causation. However, under the *McDonnell Douglas* framework, "establishing a 'causal relationship' at the *prima facie* stage is not an onerous burden." *Roberts*, 998 F.3d at 127. "Very little evidence of a causal connection is required[.]" *Burgess v. Bowen*, 466 F. App'x 272, 283 (4th Cir. 2012) (internal alterations and quotation marks omitted).

Importantly, employees "do not have to show at the *prima facie* stage that their protected activities were but-for causes of the adverse action." *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 335 (4th Cir. 2018). That showing is reserved for the final stage of the analysis. *Id.* (citing *Foster*, 787 F.3d at 251).

There are several ways to establish the causation element. For example, an employee "may establish *prima facie* causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Strothers*, 895 F.3d at 336. But "temporal proximity is not a plaintiff's only means of showing a causal connection." *Wilson v. City of Gaithersburg*, 121 F. Supp. 3d 478, 485 (D. Md. 2015). "A court may look to the intervening period for other evidence of retaliatory animus which may be used to establish causation." *Id.* (internal quotation marks and citations omitted). *See Lettieri v. Equant, Inc.,* 478 F.3d 640, 650 (4th Cir. 2007) (other relevant evidence may show causation where temporal proximity is missing).

To determine whether causation has been established, the "Fourth Circuit and its courts have looked to factors articulated in the Third Circuit's *Farrell* decision." *Mohammed v. Cent. Driving Mini Storage, Inc.*, 128 F. Supp. 3d 932, 945 (E.D. Va. 2015) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281

(3d Cir. 2000)). *See Lettieri*, 478 F.3d at 651 (citing *Farrell* and holding that "recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation"). Under this approach, "causal connection can be established through various types of circumstantial evidence such as temporal proximity, intervening antagonism or retaliatory animus, inconsistent reasons for termination, or the defendant's conduct toward others." *Mohammed*, 128 F. Supp. 3d at 945. *See McMillian v. King & Queen County Sch. Bd.*, No. 3:20CV271, 2020 WL 5552118, at *5 (E.D. Va. Sept. 16, 2020) (evidence of continuing animus can satisfy causation element); *Hinton,* 185 F. Supp. 3d ("continuing animus" can overcome temporal gap); *Willis v. City of Virginia Beach*, 90 F. Supp. 3d 597, 612 (E.D. Va. 2015) (causation established by showing of pretext). Causation can also be established by showing "that the employer took adverse action at the first convenient opportunity, even without a showing of animus." *McMillian*, 2020 WL 5552118, at *5. *See Hinton*, 185 F. Supp. 3d at 838 (recognizing "first opportunity to retaliate" theory).

## III. THE DISTRICT COURT ERRED IN FINDING INSUFFICIENT EVIDENCE OF CAUSATION.

Massaro presented sufficient evidence of causation to withstand summary judgment under both the direct and indirect evidence method and the less onerous burden shifting framework.

### A. Statements by Major Cleveland Demonstrating Continuing Animus and Retaliation at First Opportunity.

Several actions by Major Cleveland provide strong evidence of retaliation. First were his statements that he was put in charge of the firearms range *because of* Massaro's September 2018 discrimination complaint. Until that time, Massaro's Commander was Major Matos. Matos was unlikely to participate in any retaliatory scheme, as he was supportive of Massaro and clashed with the rest of the Department's leadership. JA0664-66; JA0994-98. According to Cleveland himself, Roessler decided in early 2019 to have him replace Matos because he could "fix" difficult situations. JA0573; JA0661-62.

The first thing Cleveland did was reject the staffing decisions of Massaro and Reiff. JA1178-86; JA1636-42. He then admitted to them that the range was under scrutiny by Roessler, at least in part because of Massaro's complaint. JA1645-50; JA1187-89; JA1653-54. Cleveland even said that he came to the Academy with a "clean slate," implying that he could get rid of Massaro at any time. JA1187-89; JA1649-59; JA1992.

Reiff was so concerned that he warned Massaro that "cross hairs were on him and he better watch his ass." JA1662-65. He later wrote down everything he could remember from the meeting, creating a record of what he thought were blatant statements of retaliatory intent. JA1990-92.

In a footnote, Judge Ellis inexplicably dismissed the fact that Cleveland was sent to the Academy because of Massaro's complaint as "disputed." JA2359. This was wrong. No witness disputed the substance of this conversation. Both Massaro and Reiff testified consistently and Major Cleveland, when asked if it was true, said "I don't recall, to be honest. We may have . . . I don't deny it. I just don't recall it." JA0628-29. The summary judgment standard required the court to assume that the meeting occurred as Massaro and Reiff described it. *Foster*, 787 F.3d at 248.

Judge Ellis also dismissed the matter as "not material," reasoning that even if Roesler sent Cleveland to the Academy because of Massaro's complaint, doing so was not *itself* an adverse action. JA2359. But this missed the point entirely: Cleveland was installed as the Director so he could retaliate against Massaro at the first opportunity. *Hinton*, 185 F. Supp. 3d at 838 ("Green took materially adverse action against Hinton at the first opportunity after she acquired power over Hinton"). That is precisely how Reiff interpreted Cleveland's words, leading him to warn Massaro to "watch his ass."

Even apart from the transfer, Cleveland's statement that Roessler was scrutinizing the range because of Massaro's complaint, and his threat to get rid of Massaro if he slipped up, strongly indicate a retaliatory animus. *Lettieri*, 478 F.3d at 650). Judge Ellis did not even acknowledge this important testimony.

Second was Cleveland's decision to report Massaro to IAB and OHREP just weeks after issuing the warning to Massaro. LaBarca said she never considered going to IAB; she thought Cleveland would address the matter with Massaro himself. JA0994. Instead, Cleveland claimed to view Massaro's one-off statement to LaBarca as creating a hostile work environment, even though LaBarca out-ranked Massaro, was outside his chain of command, and had no regular interaction with him. JA0640-41; JA0670-71; JA0994. A reasonable juror could have seen this as Cleveland following through on his threat to retaliate at the first opportunity. *McMillian*, 2020 WL 5552118, at *5; *Hinton*, 185 F. Supp. 3d at 838. Instead, Judge Ellis said Cleveland merely reported Massaro because he "felt obligated" to do so. This violated the court's obligation to refrain from weighing evidence or making credibility determinations on summary judgment. *Foster*, 787 F.3d at 248.

Third was Cleveland's conversations with three detectives in which he connected the LaBarca investigation to the 2018 discrimination complaint. Detectives LaScola and Guckenberger both testified during their depositions that

31

Cleveland said Massaro had a "target on his back" because of his EEO complaint. JA1997; JA2014-15. LaScola said Cleveland must have recognized that his words shocked the detectives because he then tried to walk it back, saying, "Not that you can't make a complaint. That's not what I'm saying." *Id*. LaScola said he "just couldn't believe what [Cleveland] had stated in reference to a target being on an individual's back to subordinates like us, [about] a supervisor above us, and that he's a commander." *Id*.

These comments, by the person who initiated the investigation, directly connected it to Massaro's September 2018 complaint. Yet, Judge Ellis never mentioned any of this while concluding that there was no evidence that the two were related. Any reasonable juror would have interpreted these statements, as both LaScola and Guckenberger did, as evidence that the investigation was a pretext for retaliating against Massaro. *See Hinton,* 185 F. Supp. 3d at 838 (first opportunity to retaliate); *Willis*, 90 F. Supp. 3d at 612 (causation established by showing pretext).

### B.    Interference by Majors Cleveland and Owens in the Investigation Shows Retaliatory Intent and Retaliation at First Opportunity.

Judge Ellis also ignored the extraordinary interference with the IAB investigation by Chief Roessler's command staff. In his deposition, Lt. Hirshey, the IAB investigator, admitted that his investigation was tainted by retaliatory animus. He testified that he would typically receive an allegation, study it, and

then prepare for an interview in advance.  JA0770-75.  But in Massaro's case, Major Owens, who had just spoken with Cleveland, instructed Hirshey to interview Massaro immediately.  *Id.*  Hirshey knew Massaro filed a complaint against Chief Roessler and believed Major Owens rushed the investigation because "the department or maybe from the chief down had a thought . . . Pete had this other discrimination case when [Lt. Kuhar] was promoted and, you know . . . maybe there's some way that this will turn out to be, you know, a way to get rid of Pete[.]"  JA0828-29.

Still worse, Cleveland was not content to let IAB conduct its investigation in the normal course.  He watched interviews of Massaro in-person and discussed them with Hirshey's supervisors, who then advised Hirshey how to question Massaro.  JA0649-53; JA0684-85.  At the end of the second interview, Cleveland even walked into the interview room, sat down, and mocked Massaro.  JA0701-10; JA1210-13.  Although the interview was recorded on video, there is no audio of Cleveland's conversation with Massaro.  JA0866-68.  According to Hirshey, it could only be muted from the computer in the room where Cleveland was watching.  *Id.*; JA0649-53; JA0684-85.

Instead of viewing this as further evidence of retaliation, Judge Ellis simply adopted Fairfax's version of the events.  Judge Ellis wrote that Cleveland "volunteered to go into the interview in an attempt to calm Massaro," and that

Massaro responded by yelling at him. JA2360. This was directly contradicted by Massaro, who testified that Cleveland did not seek to calm him but instead *taunted* him. JA1210-13. Judge Ellis improperly made credibility determinations, crediting Cleveland's deposition testimony over that of Massaro. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment").

This is particularly troublesome because the evidence suggested that Cleveland muted the recording. A jury may have rightly inferred that Cleveland did this so that his words would not be captured and instead credit Massaro's testimony. But Judge Ellis' opinion makes no reference to the missing audio, the unusual nature of Cleveland's involvement, or Hirshey's assessment that his own investigation was being used to retaliate against Massaro.

Nor did Judge Ellis acknowledge that Major Owens told Hirshey to substantiate a charge of "unlawful discrimination." JA0838-39; JA2361. This raised the stakes significantly; the penalty for discrimination was termination. JA0322. Hirshey believed that Owens made this change to "get rid of Pete" because of his earlier complaint against Chief Roessler. JA0842-43. Hirshey did as Owens asked and changed his report. JA0926-36. But Judge Ellis mistakenly found that Hirshey decided to sustain both charges and that Owens agreed with *him*. JA2361. Nothing in the record supports that.

34

Judge Ellis' failure to so much as mention Cleveland's interference with the investigation, or the investigator's testimony that his work was shaped and changed to "get rid of Pete," requires that his decision be vacated. A reasonable juror could have concluded, as Hirshey did, that the Department trumped up charges out of retaliatory animus.

### C. Initial Actions Taken Against Massaro Showed Intervening Antagonism and Inconsistent Explanations.

Judge Ellis also failed to consider several actions taken against Massaro as soon as the investigation began. For example, after his second interview, Massaro was relieved of duty and placed on leave. JA0501. To justify this, Major Owens claimed there were "discrepancies and inconsistencies" in Massaro's testimony. JA1921. This was categorically false. Hirshey and even Chief Roessler testified that Massaro told the truth during his interviews and that there were no discrepancies. JA0806-07; JA1838. *Willis*, 90 F. Supp. 3d at 612 (causation established by showing of pretext).

Chief Roessler then obtained permission from the County Executive to extend Massaro's leave until the investigation was complete. JA1922. But when Hirshey issued his final report in September 2019, Roessler did not return Massaro to work. Instead, he kept Massaro at home until March 2020. JA1980. In all, Roessler barred Massaro from the workplace for *ten months*. A reasonable juror

would likely conclude that the true reason was not that Massaro made a single rude comment to LaBarca, but that he accused the chief of breaking the law.

Roessler further punished and embarrassed Massaro by ordering him to submit to a mental health examination. Roessler claimed he did this because he was concerned about Massaro's well-being after he became angry during his interview. JA1793-94. This was entirely unbelievable. No reasonable Chief of Police would force a decorated Lieutenant to undergo a mental health examination over a one-time display of anger. Yet, Judge Ellis described Roessler's motive as "disputed," and then omitted it from the court's analysis. JA2361. But the summary judgment standard required the district court to view the disputed evidence most favorably to Massaro. *Foster*, 787 F.3d at 248. The court cannot simply disregard evidence wherever the moving party disputes it.

Finally, Judge Ellis further usurped the role of the jury by concluding that the mental health examination had "little to do with the complaint Massaro made 8 months earlier." JA2361. The court could only reach that conclusion by crediting Roessler's stated explanation and ignoring all the other evidence of retaliatory animus. It is the role of the jury to decide whether Chief Roessler was concerned about Massaro's well-being or seeking to punish and embarrass him.

### D.     The Department's Inconsistent and Pretextual Justifications for the Discipline.

Judge Ellis also erred by uncritically accepting the Department's proffered justification without regard to its conflicting explanations.  Although Major Owens persuaded Hirshey to add a charge of discrimination, Captain Wall correctly found there was insufficient evidence to support it.  JA0160-61.  Massaro was only charged with failing to display tact when talking to LaBarca.  *Id.*  Following a full evidentiary hearing, the panel recommended that Roessler not sustain any charge because it was unclear whether LaBarca solicited Massaro's opinion.[3]  JA1941.

Nevertheless, Roessler rejected the hearing panel's recommendation.  JA1963-65.  He said discipline was necessary for two reasons: (1) "While on duty you made unprofessional remarks to another employee which involved gender and degrading statements about this person's integrity as a commander," and (2) "You made statements regarding the suitability of the other employee's assignment to the Special Operations Division based on gender."  *Id.*

There are several problems with this.  For one, it is undisputed that these reasons are false.  Massaro never made any "degrading statements" to LaBarca about her "integrity as a commander" nor any comment about her suitability to

---

[3]     Major Owens later placed Massaro under investigation again, for telling a friend about the hearing panel's decision.  JA1003-06.

serve as Commander of the Special Operations Division. JA0916-JA1060;
JA1860-62. The totality of the allegation, as it relates to his conversation with
LaBarca, is that it was impolite for Massaro to tell LaBarca that he thought her
gender was a factor in her promotion.[4] *Holland*, 487 F.3d at 215 ("a key factor for
courts to consider is 'the probative value of the proof that the employer's
explanation is false'").

The only time Massaro commented on LaBarca's work or qualifications to
lead the Special Operations Division was during his IAB interview. This is an
important distinction. Massaro was charged with failing to display tact when
speaking with LaBarca and no opinion expressed during the investigation can
logically support the charge.

Moreover, Massaro only offered his opinion of LaBarca's work when
compelled to do so. JA0822-23. Hirshey was trying to determine whether
Massaro believed LaBarca was less qualified based on his knowledge of her past
performance or based on some implicit bias he had against women. JA1444-45.
He repeatedly asked Massaro his opinion about her work. *Id*.; JA0822-23.
Massaro knew this was a trap and told Hirshey he did not want to answer. *Id*. But

---

[4]     Promotions and assignments are independent from one another.

Hirshey pressed him, and since it was a compelled interview, Massaro faced further discipline if he did not answer fully and honestly.  *Id*.  So, he did.

But the problem is not just that Roessler was wrong; it is that Roessler admitted that these were not the real reasons he punished Massaro.  *Willis*, 90 F. Supp. 3d at 612 (causation established by showing pretext).  In his deposition, Roessler clearly and plainly said his decision had nothing to do with any degrading statements about LaBarca's integrity as a commander, or her suitability for her assignment.  JA1861-62.  And he adamantly denied that he punished Massaro for anything he said or did during the IAB interview.  *Id*.  In fact, Roessler went as far as saying it would be "unfair" to do so.  *Id*.; JA1793-94.

Nevertheless, Fairfax continued to argue that Roessler punished Massaro for what occurred during the interview.  In its motion for summary judgment, Fairfax offered two new justifications, claiming Roessler punished Massaro for "his demeanor in the second IAB interview," and for "his implicit bias."[5]  Fairfax Mem. Summ. J., July 2, 2021, (ECF No. 32), at ¶ 54.  These two reasons appear

---

[5]      This is the paradox at the center of this case.  Throughout the Department, there was wide-spread belief that Chief Roessler promoted less qualified candidates based on age, race, and gender.  JA0269-73; JA1619-1621; JA1777-78; JA1996.  But when Massaro expressed that belief, the Department turned it around on him.  The Department treated Massaro as if he could only have thought the candidates were less qualified because *he* was implicitly biased against them.

nowhere in Roessler's decision and are directly contradicted by Roessler's deposition testimony. *Mohammed*, 128 F. Supp. 3d at 946 ("evidence of inconsistent explanations by Defendant . . . satisfy the causal element and allow Plaintiff to establish his prima facie case").

Instead, Roessler said in his deposition that the real reason he disciplined Massaro was that Massaro falsely accused him of discrimination. JA1813-15. He said Massaro did not have any factual basis to conclude that LaBarca's promotion was discriminatory. *Id*. When asked why that was relevant to his finding that Massaro failed to display "tact," Roessler said that Massaro, while talking to LaBarca, "expressed his explicit bias towards this agency," and "I need to uphold the integrity of the agency." *Id*. He also said Massaro "*accus[ed] me* of doing things I have not done," *i.e.*, discriminating in promotions. *Id*.

Judge Ellis disregarded this stunning admission of retaliation by concluding that it was outside the scope of Massaro's pleading. But even if Judge Ellis was correct to deny Massaro's motion for summary judgment, which was premised on Roessler admitting retaliation for complaining of discrimination *to Lt. LaBarca*, this testimony was enough to defeat Fairfax's motion. It shows that Roessler did not punish Massaro for the reasons in his written decision, or for the reasons Fairfax now claims in this litigation, but for another reason that he did not disclose

until his deposition.  These conflicting explanations are themselves enough to defeat summary judgment.  *Mohammed*, 128 F. Supp. 3d at 945.

Ultimately, no reasonable juror would believe that Roessler put Massaro on leave for ten months, reprimanded him, and reassigned him to a midnight shift on the patrol bureau, far away from his home, over one rude comment.  Nor would any reasonable juror find it coincidental that the Department then assigned Lt. Kuhar to serve as his Commander.  Judge Ellis was wrong to conclude that "the record discloses no connection between Massaro's September 2018 complaint and the May 2019 investigation and disciplinary action."  JA2367.

## CONCLUSION

For the foregoing reasons, Peter J. Massaro respectfully requests that the Court vacate the district court's order entering summary judgment in favor of Fairfax Country and remand the matter to the district court for further proceedings.

Dated:  July 29, 2022                           Respectfully submitted,

                                                HANNON LAW GROUP, LLP


                                                   *s/Daniel S. Crowley*
                                                Daniel S. Crowley, Bar No. 989874
                                                HANNON LAW GROUP, LLP
                                                1800 M Street N.W., Suite 850 S
                                                Washington, D.C. 20036
                                                Tel: (202) 232-1907
                                                dcrowley@hannonlawgroup.com

                                                *Attorneys for Appellant Peter J. Massaro*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the requirements of Fed. R. App. P.

32(a)(5) and (6) because it has been prepared in 14-point Century, a proportionally

spaced font, and that it complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B), because it contains 8,789 words, excluding the parts exempted by

Rule 32(f), according to the count of Microsoft Word.

*s/Daniel S. Crowley*
Daniel S. Crowley

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served via the Court's electronic

filing, on July 29, 2022, to the following:

Heather K. Bardot
McGavin, Boyce, Bardot, Thorsen & Katz, PC
9990 Fairfax Boulevard, Suite 400
Fairfax, Virginia 22030
Tel: (703) 385-1000
hbardot@mbbtklaw.com

*s/Daniel S. Crowley*
Daniel S. Crowley

**ADDENDUM: UNPUBLISHED DECISIONS**

466 Fed.Appx. 272
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also U.S.Ct. of Appeals 4th Cir. Rule 32.1.
United States Court of Appeals,
Fourth Circuit.

Denise BURGESS, Plaintiff—Appellant,

v.

Stuart W. BOWEN, Jr., Special Inspector General
for Iraq Reconstruction, Defendant—Appellee,
and
Pete Geren, The Honorable, in his official
capacity as Secretary of the Army, Defendant.
Metropolitan Washington Employment Lawyers
Association, Amicus Supporting Appellant.

No. 10–2081.
|
Argued: Dec. 8, 2011.
|
Decided: Feb. 17, 2012.

**Synopsis**
**Background:** Former federal agency employee, an African
American female, brought suit against agency alleging
discrimination and retaliation based on her termination and
the denial of a transfer to another position within the
agency. The United States District Court for the Eastern
District of Virginia, James C. Cacheris, Senior District Judge,
2010 WL 3064307, granted agency's motion for summary
judgment. Employee appealed.

**Holdings:** The Court of Appeals, Diaz, Circuit Judge, held
that:

employee established a prima facie case of discriminatory
termination;

genuine issue of material fact as to whether agency's proffered
explanation for terminating employee was pretextual
precluded summary judgment;

genuine issue of material fact as to whether agency's proffered
reason for denying employee a transfer was pretextual
precluded summary judgment; and

employee established a prima facie case of retaliation.

Vacated and remanded.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

**\*273** Appeal from the United States District Court for the
Eastern District of Virginia, at Alexandria. James C. Cacheris,
Senior District Judge. (1:09–cv–00763–JCC–JFA).

**Attorneys and Law Firms**

**ARGUED:** Linda C. Bailey, Steptoe & Johnson, LLP,
Washington, D.C., for Appellant. Yiris E. Cornwall, Office
of the United States Attorney, Alexandria, Virginia, for
Appellee. **ON BRIEF:** Harry Lee, John F. O'Connor,
Michael J. Baratz, Steptoe & Johnson, LLP, Washington,
D.C.; Susan E. Huhta, Emily B. Read, The Washington
Lawyers' Committee for Civil Rights and Urban Affairs,
Washington, D.C., for Appellant. Neil H. MacBride, United
States Attorney, Kevin J. Mikolashek, Assistant United States
Attorney, Office of the United States Attorney, Alexandria,
Virginia, for Appellee. Leslie D. Alderman III, Alderman,
Devorsetz & Hora, PLLC, Washington, D.C.; Alan R. Kabat,
Bernabei & Wachtel, PLLC, Washington, D.C., for Amicus
Supporting Appellant.

Before TRAXLER, Chief Judge, and AGEE and DIAZ,
Circuit Judges.

**Opinion**

Vacated and remanded by unpublished opinion. Judge DIAZ
wrote the opinion, in which Chief Judge TRAXLER and
Judge AGEE joined.

Unpublished opinions are not binding precedent in this
circuit.

**\*274** DIAZ, Circuit Judge:

**\*\*1** Denise Burgess, an African American female, was
terminated from her executive-level position at a federal
agency, purportedly due to a reorganization necessitated by
budgetary pressures. The district court granted summary

judgment to the agency on Burgess's claims alleging discrimination and retaliation based on her termination and the denial of a transfer to another position within the agency. Viewing the record evidence in the light most favorable to Burgess, we conclude that granting summary judgment to the agency was inappropriate. Accordingly, we vacate the district court's judgment and remand for further proceedings.

## I.

We recite the facts, with reasonable inferences drawn, in favor of Burgess, the nonmovant. [1]

Congress created the office of the Special Inspector General for Iraq Reconstruction ("SIGIR") to oversee all U.S.—funded reconstruction programs and projects in Iraq. Its chief mission is to provide audit and oversight of the use, and potential misuse, of the Iraq Relief and Reconstruction Fund, and all expenditures associated with reconstruction activities in Iraq. SIGIR is also mandated to provide Congress quarterly and semi-annual reports and maintains a separate Congressional Affairs office to fulfill these responsibilities. Additionally, SIGIR maintains an office of Public Affairs responsible for the organization's external communication. Once a stand-alone office, Public Affairs is now part of the agency's Congressional Affairs office.

Since SIGIR's inception, Stuart Bowen, Jr., has served as the head of the agency. In January 2007, Bowen recruited Burgess to join SIGIR as the Assistant Inspector General for Public Affairs ("AIG–PA") through March 2008. [2] In this role, Burgess served as "the principal staff advisor and expert in the conduct of liaison with national and international news media, other collective and individual stakeholders, and public audiences for [SIGIR]." J.A. 428. In response to Burgess's request for an administrative assistant, SIGIR hired Patricia Redmon, also an African American female, as a contract employee. Although the functions of the Public Affairs office ostensibly called for four full-time employees, Burgess and Redmon were the office's only employees during Burgess's tenure.

Following a brief detail to the U.S. State Department, Ginger Cruz returned to SIGIR in February 2007 as a "Senior Advisor." In June 2007, Cruz was restored to her former post as Deputy Inspector General for Policy, where she directly supervised Burgess. According to Burgess, Cruz took an immediate dislike to her and began usurping Burgess's

authority and duties and making discriminatory and harassing remarks. In one such incident, Cruz "out of the blue" told Burgess that "people who file discrimination complaints are weak links in the chain ... looking to excuse their own personal failing." *Id.* 1350. Burgess interpreted this comment as racial bias directed against her specifically. Burgess eventually raised the issue of Cruz's general hostility toward her with SIGIR's Chief of Staff Nick Arnston, alleging that Cruz was targeting her because of her race.

**\*275  \*\*2** On July 19, 2007, Cruz notified Burgess that Redmon was to be terminated in two weeks' time. Burgess responded that she believed that she and Redmon were being targeted, and that the Public Affairs section—then consisting solely of two African American women—was being singled out for elimination. Burgess also expressed that it would be difficult for her to manage the section's workload without an assistant. Cruz did not respond directly to Burgess's claim that she and Redmon were being targeted, but did assure Burgess that she would have adequate administrative support going forward.

On July 23, Burgess sent an email to Cruz in which she questioned the "fairness and equality" of the decision to terminate Redmon. *Id.* 305. She asked to meet with Cruz to discuss the matter. Cruz in turn contacted Arnston and requested that he arrange a meeting between Cruz and Patrick Bowers, SIGIR's deputy general counsel. The purpose of that meeting was to discuss, among other topics, "EEO [Equal Employment Opportunity]" matters. *Id.* 1945.

Later that day, Cruz notified Burgess in a meeting also attended by Bowers that Burgess's AIG–PA position was being eliminated because of budget constraints. When Burgess pressed for a more detailed explanation, Cruz responded that the position was being eliminated as part of a budget-driven reorganization and that SIGIR required the "right mix of people." *Id.* 159. Cruz resisted Burgess's further inquiries, and informed Burgess that she was to remain on paid administrative leave until September 1, 2007, although she was not to return to work after July 27. Arnston later wrote to Burgess and explained that she was being terminated "[d]ue to the reorganization of the Office of Public Affairs." *Id.* 386.

Separately, also on July 23, Cruz asked Arnston to draft a position description for a new Director of Public Affairs ("DPA") position. A former SIGIR employee, Kristine Belisle, a white woman, was selected for the new position, even though performance deficiencies were in part

responsible for her initial departure from SIGIR in March 2007. Cruz later explained that Belisle was hired over Burgess because the DPA role required "someone who was able to do the heavy lifting, who was not above making the phone calls, who was not above doing ... the day-to-day scheduling, management and callbacks." *Id.* 65. [3]

It was common practice in SIGIR to reassign employees who were terminated, whether through a "reorganization" or otherwise, to other positions within the agency. Despite Burgess's laudable work—as evidenced by her receipt of a letter of commendation for "exemplary service on the job" accompanied by an $8500 cash reward on May 31, 2007, and a separate **\*276** letter from Arnston in which he congratulated Burgess on her fine performance—she was not offered another position in the agency.

Burgess was the only African American member of SIGIR's senior management at the time, the only member of senior management to be involuntarily terminated, and the only SIGIR employee terminated as part of the agency's reorganization.

**\*\*3** After exhausting her administrative remedies, Burgess filed a four-count complaint in the district court alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* with respect to her termination and the denial of her transfer to the DPA position or another position within the agency. SIGIR moved for summary judgment, which the district court granted. Burgess timely appealed.

## II.

### A.

We review de novo a grant or denial of summary judgment, applying the same standard applied by the district court. *Overstreet v. Ky. Cent. Life Ins. Co.,* 950 F.2d 931, 938 (4th Cir.1991). Summary judgment is appropriate only where the record shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The summary judgment inquiry turns on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505. Only in the latter case

may the court grant summary judgment, but a jury must resolve the dispute if the evidence permits either of two reasonable conclusions. *Id.* at 250–51, 106 S.Ct. 2505; *In re French,* 499 F.3d 345, 352 (4th Cir.2007).

It is not the district court's role to "weigh the evidence and determine the truth of the matter" but instead to determine whether there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. A district court considering a motion for summary judgment must view the evidence in the light most favorable to the nonmoving party, *Unus v. Kane,* 565 F.3d 103, 115 (4th Cir.2009), and draw all inferences in favor of the nonmovant, *Williams v. Griffin,* 952 F.2d 820, 823 (4th Cir.1991).

### B.

A three-step framework applies to the resolution of discrimination and retaliation claims where, as here, there is only circumstantial evidence. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (discrimination); *Lamb v. Boeing,* 213 Fed.Appx. 175, 179 (4th Cir.2007) ("Retaliation claims function in parallel.") (citing *Beall v. Abbott Labs.,* 130 F.3d 614, 619 (4th Cir.1997)). First, the plaintiff has the initial burden to prove her prima facie case by a preponderance of the evidence, which she may do by "proving a set of facts which would enable the fact-finder to conclude, in the absence of any further explanation, that it is more likely than not that the adverse employment action was the product of discrimination [or retaliation]." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 58 (4th Cir.1995) (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). If such a showing is made, the burden shifts to the defendant to come forward with evidence that "if believed by the trier of fact, would **\*277** support a finding that unlawful discrimination [or retaliation] was not the cause of the employment action." *Hicks,* 509 U.S. at 507, 113 S.Ct. 2742 (citing *Burdine,* 450 U.S. at 254–255, 101 S.Ct. 1089). If the defendant makes such a showing, the presumption created by the plaintiff's prima facie case "drops out of the picture," and the burden

shifts back to the employee to present evidence from which a reasonable juror could find that the proffered reason was a pretext for discrimination or retaliation. *Id.* at 511, 113 S.Ct. 2742 (citing *Burdine,* 450 U.S. at 255, 101 S.Ct. 1089). If the plaintiff can demonstrate "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination [or retaliation]," summary judgment is not appropriate. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

**\*\*4** The parties dispute whether the district court applied an incorrect standard in evaluating Burgess's discrimination claims. Following the Supreme Court's opinion in *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), many district courts required plaintiffs to provide additional evidence to demonstrate racial discrimination, once the burden shifted back to the plaintiff after an employer's proffer of a legitimate nondiscriminatory reason for its action. This "pretext plus" standard stemmed from the Court's pronouncement that, after the employer's proffer, "[t]he plaintiff then has 'the full and fair opportunity to demonstrate,' through presentation of his own case and through cross-examination of the defendant's witnesses, 'that the proffered reason was not the true reason for the employment decision,' and that race was." *Id.* at 507–08, 113 S.Ct. 2742 (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089).

In *Reeves v. Sanderson Plumbing Prods. Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court clarified that a prima facie case of discrimination, combined with evidence from which a jury could conclude that an employer's proffered justification was false, supported an inference of discrimination sufficient to defeat summary judgment. In other words, a plaintiff is not required to provide additional evidence that race was the true reason for the employment decision. The Court further explained as follows:

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive. In appropriate circumstances, the trier of fact can

reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.... Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, a plaintiff's prima facie case, combined with sufficient evidence to find the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Id.* at 147–48, 120 S.Ct. 2097 (citations omitted).

*Reeves* did allow, however, that a prima facie case of discrimination combined with evidence of pretext might fail to sustain a jury's finding of liability, in unique situations where "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." **\*278** *Id.* at 148, 120 S.Ct. 2097; *accord* *Murrell v. Ocean Mecca Motel, Inc.,* 262 F.3d 253, 258–59 (4th Cir.2001) ("[O]nce a plaintiff has established a prima facie case and shown the defendant's explanation to be false, the plaintiff need not submit additional evidence of discrimination unless 'no rational factfinder could conclude that the action was discriminatory.' " (quoting *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097)).

**\*\*5** Applying the *McDonnell Douglas* framework, the district court found with respect to all four claims that Burgess either failed to establish a prima facie case of discrimination or retaliation, or failed to demonstrate pretext after SIGIR provided legitimate nondiscriminatory reasons. The district court thus granted summary judgment to SIGIR on all four of Burgess's claims. Burgess contests the district court's ruling on each claim, asserting that the district court (1) held her discrimination claims to the "pretext-plus" standard the Supreme Court rejected in *Reeves* and (2) erred in

concluding that there was no evidence to support a causal connection between Burgess's protected activity and the agency's decision to both terminate Burgess and deny her a transfer. We address each claim in turn.

### III.

### A.

Burgess first contends that she suffered racial discrimination when her AIG–PA position was terminated and when a less qualified white woman was selected for the DPA position created in its place. To establish a prima facie case of discriminatory termination, a plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for her job and her job performance was satisfactory; (3) in spite of her qualifications and her performance, she was fired; and (4) she was replaced by someone outside her protected class, or otherwise treated differently than similarly situated persons outside the class. *See* *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. The district court characterized the last prong as whether "the position remained open to similarly qualified applicants after her dismissal." *Burgess v. Bowen,* No. 09–763, 2010 WL 3064307, at *8 (E.D.Va. Aug. 2, 2010) (quoting *Williams v. Cerberonics,* 871 F.2d 452, 455–56 (4th Cir.1989)).

The district court held that Burgess had not established her prima facie case. Specifically, the court concluded that Burgess was not replaced by someone outside her protected class because the AIG–PA position had been eliminated and thereby did not remain open to similarly qualified applicants following Burgess's dismissal. Further, the district court concluded that the new DPA position was not, contrary to Burgess's assertion, the functional equivalent of the AIG–PA position. As evidence of this, the district court relied on certain differences in the written descriptions of the positions and the responsibilities thereunder. The district court further accepted SIGIR's contention that the new position was ministerial in nature involving no management or supervision of employees, in contrast to the autonomous managerial and policy functions of the AIG–PA position.

Neither party has articulated a standard by which to properly assess whether a position remains open in the face of some changes in the written job description. Both parties do,

however, draw our attention to *Murray v. Gilmore,* 406 F.3d 708, 714 (D.C.Cir.2005), in which the D.C. Circuit concluded that the plaintiff offered "plentiful evidence from which a jury could conclude that rather than functionally eliminating the [plaintiff's position], [the defendant] simply gave the position a **\*279** new title and tapped [someone else] to hold it." That case offers us little guidance, however, because the defendant there acknowledged that the two positions had "comparable, dual, functionally equivalent, overlapping responsibilities," and admitted that "a reasonable jury could conclude that [the defendant's proffer] was pretext." *Id.* (internal quotations omitted). There has been no such admission here, nor does a straightforward comparison of the written job descriptions clearly indicate whether or not the positions are functionally equivalent.

**\*\*6** We accept the district court's premise that there may be circumstances in which the differences between two written job descriptions are so stark such that it cannot be said that "the [first] position remained open to similarly qualified applicants," *Burgess,* 2010 WL 3064307, at *8. In this case, however, the district court failed to credit Burgess's evidence tending to show that the positions were intended to be functionally equivalent and that both involved the same managerial and oversight responsibilities.

Specifically, Cruz initially sought to hire Belisle under the identical title, responsibilities, and salary as enjoyed by Burgess, but shifted gears after being alerted that her proposal was inconsistent with the agency's contention that Burgess's position was eliminated because of a reorganization. Only then did the agency revise the description, responsibilities, and salary of the DPA position. Despite the changes, however, Belisle testified that, as the DPA, she in fact "was the sole person managing public affairs, in the sense that [she] was the sole person implementing the skills and activities of the position." J.A. 1260. The new DPA position also involved the supervision of a support staff member who split time with Public Affairs and another department.

Because the district court failed to view this evidence in the light most favorable to Burgess, it erred in finding that Burgess had not established her prima facie case. Indeed, the transfer of most of the AIG–PA responsibilities to the DPA position was, in our view, itself sufficient to meet Burgess's burden. *See* *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1225 (2d Cir.1994) (holding that the plaintiff established a prima facie case where the employer

reassigned almost all of plaintiff's duties to an employee outside of the plaintiff's protected class). Although the district court found that the "AIG–PA position was eliminated" and "reject[ed the contention] that it was merely 'renamed' as the Director of Public Affairs," 🚩 *Burgess,* 2010 WL 3064307, at *9, a reasonable jury could conclude otherwise. *See* 🚩 *Garcia v. Pueblo Country Club,* 299 F.3d 1233, 1239–41 (10th Cir.2002) (reversing summary judgment because whether plaintiff's position was eliminated or he was replaced was a "key" material factual dispute).

The district court's analysis nevertheless assumed that Burgess had established a prima facie case, but concluded that SIGIR had provided legitimate nondiscriminatory reasons for Burgess's termination: that budgetary pressures necessitated the elimination of Burgess's position, that the entire Public Affairs section was reorganized, and that other employees were terminated or had their contract positions revoked. Accordingly, the district court found that Burgess failed to establish that SIGIR's reason for her termination was pretextual. Specifically, the district court held that "Plaintiff must show there is a genuine issue of material fact regarding a connection between her race and her adverse employment action" and "Plaintiff has not come forward with evidence that these **\*280** acts were motivated by race discrimination." 🚩 *Burgess,* 2010 WL 3064307, at *11.

**\*\*7** Viewed in the light most favorable to Burgess, however, the record evidence reveals significant inconsistencies as to whether other employee or contract positions were eliminated as part of a reorganization, whether budgetary pressures in fact necessitated the elimination of Burgess's position, when the decisions were made to execute any reorganization, whether the Public Affairs section was actually reorganized to promote savings, and whether the elimination of Burgess's position actually achieved any meaningful savings. Although the district court was not persuaded by this evidence, the proper standard is whether a reasonable jury could have found SIGIR's proffered explanation incredible and, thus, could have concluded that Burgess's termination was discriminatory.

We hold that the district court erred in concluding, as a matter of irrebuttable fact, that the AIG–PA position had been eliminated and that the position created in its place was not sufficiently similar to present that issue to the jury. Second, the court failed to view the record evidence supporting Burgess's challenges to the credibility of SIGIR's proffered

explanation in the light most favorable to her, and thus failed to apprehend that such evidence standing alone was sufficient to show pretext after SIGIR proffered its nondiscriminatory explanation.

Accordingly, we vacate the district court's decision to grant summary judgment to SIGIR on Burgess's first claim of discriminatory termination.[4]

**B.**

Burgess also alleges that she suffered racial discrimination when she was denied a transfer to the DPA position or a "Senior Advisor" position to which terminated employees were routinely assigned.[5] To establish a prima facie case for a discriminatory denial of transfer claim, a plaintiff must show that (1) she is a member of a protected group; (2) she applied **\*281** for the position in question;[6] (3) she was qualified for the position; and (4) she was rejected for the position in favor of someone not a member of the protected group under circumstances giving rise to an inference of unlawful discrimination. 🚩 *Lowery v. Circuit City Stores, Inc.,* 158 F.3d 742, 760 (4th Cir.1998) (vacated on other grounds).

The district court found that Burgess had established a prima facie case with respect to this claim. However, the court again found that SIGIR had proffered a legitimate nondiscriminatory reason for denying Burgess the transfer: that Burgess "was not the person for the job," 🚩 *Burgess,* 2010 WL 3064307, at *12 (internal quotations omitted), and that "Cruz genuinely perceived that the new ... position should be filled by a lower level, hands-on employee," 🚩 *id.* at *13, who would "do the heavy lifting, who was not above making the phone calls ... the day-to-day scheduling, management and callbacks," 🚩 *id.* at *12 (internal quotations omitted). The district court concluded that Burgess had failed to present evidence to establish that this proffered reason was pretextual.

**\*\*8** SIGIR asserts that Burgess's own complaints about lacking administrative support and resources rendered her unfit for the DPA position. While Burgess admits to complaining about being understaffed during her time as the AIG–PA, this does not necessarily compel the conclusion that she was unable to accomplish the tasks required of the DPA position. On that score, Burgess points to evidence showing that she was awarded a bonus for exemplary performance

and that she routinely worked late hours to execute the functions of the Public Affairs office. This evidence, Burgess contends, demonstrates that she was fully able and willing to assume any responsibilities called for by the DPA position. Burgess further contends that Belisle—who herself had been terminated at least in part for poor performance—was in no better position to do so. Finally, Burgess argues that SIGIR's vague characterization that she "was not the person for the job," 🚩 *id.* at \*12 (internal quotations omitted), cannot suffice as a legitimate nondiscriminatory reason for denying her the transfer; in fact, she contends that the statement could just as well reveal racial animus. We agree with Burgess that it should be up to a jury whether to credit SIGIR's explanation.

Although we agree with the district court that "there must be a sufficient record of proof for a reasonable jury to agree [that race was the basis for denying Burgess a transfer]," 🚩 *id.* at \*13 (citing 🚩 *Ross v. Commc'ns Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985)), we find Burgess satisfies this standard. Burgess's evidence as to this claim reveals inconsistencies undermining the credibility of SIGIR's proffered explanation as to why it declined to offer Burgess a transfer to the DPA position. Under *Reeves,* Burgess was required to do no more to survive a motion for summary judgment. Accordingly, we vacate the district court's decision as to this claim.

## C.

Burgess also alleges that she suffered unlawful retaliation, once when she was terminated and again when she was denied a transfer. To establish a prima **\*282** facie case for retaliation, a plaintiff is required to prove the following: (1) she engaged in a protected activity; (2) an adverse employment action was taken against her; and (3) there was a causal connection between the first two elements. 🟡 *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 656 (4th Cir.1998). If she does so, the burden shifts to the defendant to proffer a legitimate, nonretaliatory reason for its decision, which she must then rebut. *Id.* The district court assumed that Burgess engaged in protected activity, but found that her claims failed the third prong because the decisions to terminate Burgess's position and to hire Belisle were made as part of SIGIR's reorganization plan prior to Burgess engaging in any protected activity.

The parties first contest whether Burgess in fact engaged in protected activity. Burgess contends that she engaged in two protected acts, the first when she verbally complained to Cruz that she and Redmon were being "targeted," and the second when she questioned the "fairness and equality" of Redmon's termination in a subsequent email to Cruz. As to the first point, Burgess explains that her "intent of using the word targeted was to alert [Cruz] in very concrete terms that there was concern on [Burgess's] part that this was racial." J.A. 1371. As to the second point, Burgess asserts that her email borrowed verbatim from language that appeared on the Equal Employment Opportunity Commission website and was also contained in SIGIR's EEO policy.

**\*\*9** Our cases hold that an employee's complaint constitutes protected activity when the employer understood, or should have understood, that the plaintiff was opposing discriminatory conduct. *Richardson v. Richland Cnty. School Dist. No. 1,* 52 Fed.Appx. 615, 617 (4th Cir.2002) (citing 🟡 *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 291–92 (2d Cir.1998) ( "[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII.")); *Sajadian v. Am. Red Cross,* No. 99–1263, 1999 WL 1111455, at \*1 (4th Cir. Dec.7, 1999) (same); *see also* EEOC Compliance Manual § 8–II.B.2 (2006) ("[A] protest is protected opposition if the complaint would reasonably have been interpreted as opposition to employment discrimination."). Determining whether an employer should have understood a complaint to constitute protected activity requires courts to consider whether the complaint could reasonably have led the employer to understand the nature of the complaint in the context in which it was made. *Richardson,* 52 Fed.Appx. at 617.

We find that SIGIR actually understood or should have understood that Burgess was complaining of discriminatory conduct. *See* 🟡 *Okoli v. City of Baltimore,* 648 F.3d 216, 224 (4th Cir.2011) (finding that it was "enough for [the plaintiff] to twice complain of 'harassment,' even if it might have been more ideal for her to detail the sexual incidents she later relayed" and that the employer "surely should have known that [the plaintiff's] complaints of 'harassment' likely encompassed sexual harassment"). Indeed, the response to Burgess's email underscores our conclusion, because Cruz almost immediately asked to consult with SIGIR's

counsel after receiving Burgess's complaint, and the ensuing discussions included "EEO" issues. The evidence also shows that Cruz, whose former role as SIGIR's Chief of Staff made her well familiar with personnel matters, forwarded Burgess's complaint to Arnston, SIGIR's then chief of staff, who had already discussed with Burgess her concerns about **\*283** race discrimination. Three attorneys, including one experienced in employment law, also received Burgess's complaint. On these facts, we have no trouble concluding that SIGIR either understood, or at the very least should have understood, that Burgess was complaining of discriminatory conduct.

Turning now to the merits of the retaliation claims, we acknowledge that some of the evidence before the district court supports SIGIR's position that the decision to terminate Burgess, as well as the decision to hire Belisle for the DPA position, occurred prior to Burgess's engaging in protected activity. However, in *Okoli* we found it "deeply suspicious" that an employee was fired only hours after she complained to her superiors. *Id.* at 223. Further, we found it "undisputed" that the employee's supervisor fired the employee "only after learning of her complaint" and that "[e]ven assuming [the supervisor] previously contemplated firing her—[the employee's] complaint might have been an additional or superseding cause of her ultimate termination." *Id.* at 224. We therefore concluded that "[a]ny dispute about [the employer's] alternative, legitimate basis for firing her returns to the question of mixed-motives and pretext." *Id.* at 225.

**\*\*10** In this case, a jury could reasonably find that the decision to terminate Burgess and to hire Belisle occurred only after Burgess challenged the fairness and equality of the decision to terminate Redmon. Specifically, Burgess presented evidence that, only after Cruz received Burgess's email, did Cruz (1) telephone Belisle to offer her a contract position handling the public affairs duties (before the DPA position was finalized), (2) instruct Arnston to draft a description for the new DPA position, and (3) schedule a meeting to inform Burgess of her termination. Finally, and most probative on Burgess's retaliatory denial of transfer claim, is Cruz's own admission that she would have considered offering Burgess another position had the conversation during Burgess's termination meeting gone differently. [7]

We have held that "[v]ery little evidence of a causal connection is required to establish a prima facie case [of retaliation]," *Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 443 (4th Cir.1998) (overruled on other grounds); temporal proximity between the protected activity and the employer's adverse action alone will suffice, *see Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); *accord Price v. Thompson,* 380 F.3d 209, 213 (4th Cir.2004). We agree with Burgess that she has established a prima facie case of retaliation. In concluding otherwise, the district court again failed to view the evidence in the light most favorable to Burgess.

Burgess's claims may nevertheless fail if she cannot overcome SIGIR's proffer of a legitimate, nonretaliatory explanation. The district court dispensed with this analysis having found no prima facie case. We find here that the question of whether the agency proffered a nonretaliatory reason for terminating Burgess and denying her the transfer merges with our prior discussion concerning the agency's proffered reason in the context of Burgess's discrimination claims. Although we agree with the district court that the agency has proffered a legitimate nonretaliatory reason, Burgess's prima facie evidence combined with the additional evidence tending to **\*284** undermine the credibility of that reason suffices to defeat the agency's motion for summary judgment.

IV.

In sum, the record in this case reveals an abundance of genuine factual disputes on material issues. While we have viewed and recounted the facts in the light most favorable to Burgess, we acknowledge that SIGIR's contentions also find support in the record. Be that as it may, the evidence in this case was not "so one-sided" as to warrant granting SIGIR's motion for summary judgment on Burgess's claims. Accordingly, we vacate the district court's judgment and remand for further proceedings.

*VACATED AND REMANDED.*

**All Citations**

466 Fed.Appx. 272, 2012 WL 517190

## Footnotes

1    *See* *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

2    Because SIGIR is a limited-purpose, temporary agency, all employees serve for a specified term.

3    Cruz admitted, however, that she might have been open to hiring Burgess in another capacity had their July 23 meeting gone differently.

        Q: But yet there could be no opportunity for [Burgess] to be the director of public affairs?

        A: No.

        Q: No opportunity anywhere else in the agency?

        A: No.

        Q: And no discussion whatsoever of other opportunities?

        A: No.

        Q: However, had the conversation that you had on July 23rd gone differently, you may have been able to explore some opportunity?

        A: I would have spoken to her about it. I don't know that we would have arrived at anything other than the decision we ended up with.

        *Id.* 1677.

4    The parties also dispute the district court's finding of a "same actor" inference, which permits courts to reject discriminatory termination claims when the same actor both hired and fired the plaintiff. As we have held, "[w]hen the hirer and firer are the same individual, there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer, and the early resolution of this question need not be derailed by strict fealty to proof schemes." *Proud v. Stone,* 945 F.2d 796, 798 (4th Cir.1991). The district court found that the same actor inference applied, because Burgess was both hired and fired by Bowen. Burgess contends that she was hired by Bowen and fired by Cruz, the latter decision occurring under circumstances showing that Bowen merely rubber-stamped Burgess's termination after delegating personnel decisions to Cruz. Viewed in the light most favorable to Burgess, the evidence presents a genuine issue of fact as to who made the decision to terminate Burgess, and thus whether the same actor inference should apply.

    *See, e.g.,* *Schmidt v. Montgomery Kone, Inc.,* 69 F.Supp.2d 706, 711 (E.D.Pa.1999) (distinguishing *Proud* and holding that reliance on the "same actor" inference at the summary judgment stage is misplaced where there exists a factual dispute regarding who hired and fired the plaintiff). Indeed, Cruz herself testified that she made the decision to terminate Burgess, and Bowen agreed thereafter.

5    Burgess contends that it was SIGIR's common practice to assign underperforming employees, or those whose positions had been eliminated, to "Senior Advisor" positions. She argues that the fact that she was not offered such a position demonstrates further that she suffered discrimination. SIGIR disputes this claim, arguing that no such policy existed. Because we find for Burgess on her contention that she was denied a transfer to the DPA position, we do not address this separate argument.

6     As the district court acknowledged, Burgess cannot show that she applied for or requested a transfer within the agency. Burgess did, however, file a declaration stating that she "would have chosen to stay on at SIGIR in the Director of Public Affairs position or any other position in lieu of termination," *id.* 2118 (internal quotations omitted), which the agency did not rebut. On this record, the district court elected to treat Burgess as though she had applied for a transfer, a determination that the agency does not challenge on appeal.

7     Even if the decision to terminate Burgess had already been made, denying Burgess a transfer itself constitutes an adverse action and entitles her to present her retaliation claim to the jury. *See* *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 62, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

---

**End of Document**        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 5552118
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Richmond Division.

Davida MCMILLIAN, Plaintiff,

v.

KING & QUEEN COUNTY
SCHOOL BOARD, et al., Defendants.

Civil No. 3:20cv271 (DJN)

|

Signed 09/15/2020

|

Filed 09/16/2020

**Attorneys and Law Firms**

Richard F. Hawkins, III, The Hawkins Law Firm PC, Richmond, VA, for Plaintiff.

Pakapon Phinyowattanachip, Andrew Paul Selman, Haney Phinyowattanachip PLLC, Richmond, VA, for Defendants.

**MEMORANDUM OPINION**

David J. Novak, United States District Judge

**\*1** Plaintiff Davida McMillian ("Plaintiff") brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1983 against Defendants the King & Queen County School Board (the "Board") and Carol B. Carter, Ed.D. ("Dr. Carter"), (collectively, "Defendants"), alleging that Defendants discriminated against her, because of her race and her association with the National Association for the Advancement of Colored People ("NAACP"), by failing to renew her employment contract for the 2019-2020 school year.

This matter now comes before the Court on Defendants' Motion to Dismiss (ECF No. 11), which moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Count II of Plaintiff's First Amended Complaint for failure to state a claim. For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss (ECF No. 11), and DISMISSES WITH PREJUDICE Count

II of Plaintiff's First Amended Complaint (ECF No. 9) to the extent it states a claim against the Board.

**I. BACKGROUND**

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept Plaintiff's well-pleaded factual allegations as true, though the Court need not accept Plaintiff's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). With this principle in mind, the Court accepts the following facts.

**A. Alleged Discrimination by Defendants**

Plaintiff worked for the Board for a total of fourteen years. (1st Am. Compl. ("Am. Compl.") (ECF No. 9) ¶ 7.) During the four years that immediately preceded her separation, Plaintiff served as the Lead Cafeteria Manager. (Am. Compl. ¶ 7.) Plaintiff performed that job with distinction, earning a Certificate of Appreciation from Superintendent Dr. Carter at a June 2018 meeting, and, in August 2018, receiving Dr. Carter's praise for an article in the local newspaper. (Am. Compl. ¶ 8.)

However, before the 2018-2019 school year, Dr. Carter became aware that Plaintiff — an African-American woman — served as the provisional Vice-President for the local NAACP chapter. (Am. Compl. ¶¶ 2, 10.) Moreover, Dr. Carter knew that the NAACP chapter discussed citizen concerns respecting Dr. Carter's treatment of African-American administrators, staff and students at the school. (Am. Compl. ¶ 10.) Dr. Carter's knowledge of Plaintiff's association with the NAACP became apparent during a budget meeting when Dr. Carter confronted Plaintiff and said: "You need to tell me when and where you are having NAACP meetings." [1] (Am. Compl. ¶ 11.) The tone of Dr. Carter's voice — coupled with the irrelevance of the comment in the context of a budget meeting — conveyed to Plaintiff that Dr. Carter did not appreciate Plaintiff's NAACP membership. (Am. Compl. ¶ 11.)

**\*2** Subsequently, Plaintiff communicated with a black school board member about Dr. Carter's comments to her. (Am. Compl. ¶ 14.) That school board member said that Dr. Carter had made similar comments to the board member. (Am. Compl. ¶ 14.)

McMillian v. King & Queen County School Board, Slip Copy (2020)

2020 WL 5552118

Beginning in the Fall of 2018, Dr. Carter began to undermine Plaintiff's job performance. (Am. Compl. ¶ 15.) Specifically, Dr. Carter ostracized Plaintiff by not inviting her to administrative meetings that Plaintiff had previously attended and by no longer speaking to her. (Am. Compl. ¶ 15.) Additionally, in January 2019, Dr. Carter asked a cafeteria staffer if the staffer or other co-workers had ever experienced any issues with Plaintiff. (Am. Compl. ¶ 15.) The staffer replied in the negative. (Am. Compl. ¶ 15.)

In April 2019, Plaintiff's supervisor — whom Dr. Carter had recently appointed — wrote a Letter of Reprimand against Plaintiff based on a false claim that Plaintiff had improperly investigated a fellow employee and then issued unauthorized discipline to that employee. (Am. Compl. ¶ 16.) In truth, Plaintiff committed neither offense, as evidenced by the fact that the supervisor issued the Letter of Reprimand two months after the alleged incident took place. (Am. Compl. ¶ 16.)

On May 8, 2019, Plaintiff had her annual performance review. (Am. Compl. ¶ 17.) Unlike prior reviews, Plaintiff received criticism for alleged communication problems with her staff. (Am. Compl. ¶ 17.) And again, her supervisor renewed the false claim about unauthorized discipline. (Am. Compl. ¶ 17.) Ultimately, Plaintiff's superiors prescribed a four-week improvement plan, with a target completion date of June 5, 2019. (Am. Compl. ¶ 17.)

Although Plaintiff complied with the terms of the improvement plan, Defendants never afforded her the opportunity to complete it. (Am. Compl. ¶ 18.) Instead, by letter dated May 21, 2019, Dr. Carter advised Plaintiff that Defendants were not renewing Plaintiff's contract for the upcoming school year. (Am. Compl. ¶ 18.) The decision not to renew Plaintiff's contract represented Defendants' "very first opportunity" to take retaliatory action against Plaintiff because of her membership in the NAACP. (Am. Compl. ¶ 31.) When Plaintiff asked Dr. Carter why Defendants decided against renewing her contract (the letter provided no reason for the decision), Dr. Carter responded that Defendants had decided to go in a "different direction" with the food service department. (Am. Compl. ¶¶ 18, 20.) On the same day that Dr. Carter and Plaintiff spoke about the non-renewal of her contract, Dr. Carter offered Plaintiff's job to a white employee with far less experience than Plaintiff. (Am. Compl. ¶ 19.)

After Plaintiff left her position with the Board, she applied for unemployment benefits. (Am. Compl. ¶ 20.) Although Plaintiff's non-renewal letter provided no basis for the Board's decision, and despite Dr. Carter's statement that Defendants were merely going in a "different direction," the Board advised the Virginia Employment Commission that Plaintiff had been terminated, because she had conducted an unauthorized investigation of an employee and had made negative comments about an employee. (Am. Compl. ¶ 20.) Neither assertion proved true, and the Commission awarded benefits to Plaintiff. (Am. Compl. ¶ 20.)

**B. Plaintiff's Amended Complaint**

 **\*3** On April 14, 2020, Plaintiff filed her initial Complaint (ECF No. 1) against Defendants and, after Defendants moved to dismiss, Plaintiff filed her Amended Complaint (ECF No. 9) on July 6, 2020. In her Amended Complaint, Plaintiff raises two counts for relief based on the above allegations. In Count I, Plaintiff alleges that the Board discriminated against her based on her race in violation of Title VII of the Civil Rights Act of 1964. (Am. Compl. ¶¶ 23-27.) In Count II, Plaintiff alleges that the Board and Dr. Carter retaliated against her for participating in and being an active member of the NAACP. [2] (Am. Compl. ¶¶ 28-34.) Specifically, Plaintiff alleges that participation in the NAACP constitutes a protected activity within the meaning of the First Amendment, and that, because of her participation in the NAACP, Defendants retaliated against her by not renewing her contract of employment for the 2019-2020 school year. (Am. Compl. ¶¶ 28-34.) As such, Plaintiff brings Count II under 42 U.S.C. § 1983. (Am. Compl. ¶ 29.)

From these counts, Plaintiff seeks, among other things, a declaratory judgment that Defendants' actions violated Title VII and the First Amendment; an award of compensation for loss of money and other benefits; an award for front pay and back pay; and an award for punitive damages against Dr. Carter. (Am. Compl. at 9.)

**C. The Board's Motion to Dismiss**

In response to Plaintiff's Amended Complaint, on July 20, 2020, Defendants filed their Motion to Dismiss (ECF No. 11), moving to dismiss Count II of Plaintiff's Amended Complaint for failure to state a claim. In support of their Motion, Defendants argue that Plaintiff fails to allege facts that establish a causal nexus between Plaintiff's alleged protected activity and the nonrenewal of her contract. (Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.") (ECF No. 12) at 1-2.) In any event, Defendants argue that Count II fails as against the Board, because Plaintiff cannot show that the

constitutional violation at issue resulted from a policy or custom of discrimination. (Defs.' Mem. at 8-10.) Moreover, Defendants contend that Count II fails as against Dr. Carter, because Dr. Carter enjoys qualified immunity. (Defs.' Mem. at 10-11.) On that score, Defendants do not argue that the constitutional violation alleged — if proven — fails for want of being clearly established. (Defs.' Mem. at 10-11.) Instead, Defendants appear to argue that Plaintiff's Amended Complaint simply fails to state a claim for First Amendment retaliation. [3] (Defs.' Mem. at 11.)

Plaintiff filed her Memorandum in Opposition to the Motion to Dismiss on August 7, 2020, agreeing to dismiss Count II against the Board. (Pl.'s Resp. at 1, n. 1.) Plaintiff argues, however, that Count II states a claim against Dr. Carter, because Plaintiff has plausibly alleged a causal nexus between Plaintiff's protected activity and the nonrenewal of her contract. (Pl.'s Resp. at 7-13.) Defendants filed their Reply on August 17, 2020, (Defs.' Reply Mem. in Supp. of Mot. to Dismiss) ("Defs.' Reply") (ECF No. 19) agreeing that causation remains the only issue for the Court to decide, rendering the matter ripe for review.

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve contests surrounding the facts, determine the merits of a claim or address potential defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court will accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to the plaintiff.

*Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

**\*4** Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests[.]' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a

cause of action," though the law does not require "detailed factual allegations." *Id.* (citations omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint or counterclaim must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at 557. And the facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

## III. ANALYSIS

### A. The Court Dismisses Count II of the Amended Complaint As Alleged Against the Board.

As discussed above, the Board argues that the Amended Complaint fails to state a § 1983 claim against the Board, because Plaintiff fails to allege that the nonrenewal of her contract resulted from an unconstitutional policy or custom. (Defs.' Mem. at 8-10.) Plaintiff does not challenge that argument, and now agrees that the Court should dismiss Count II insofar as it states a claim against the Board. (Pl.'s Resp. at 1, n. 1.)

Accordingly, because Plaintiff concedes that she could not state a claim against the Board under any set of facts, the Court will dismiss Count II against the Board with prejudice. *Billups v. United States*, 433 F. Supp. 3d 916, 923 n. 1 (E.D. Va. 2020).

### B. The Amended Complaint Plausibly Alleges a Causal Nexus between Plaintiff's Protected Activity and the Nonrenewal of Her Contract.

Defendants argue that Plaintiff fails to state a plausible free association retaliation claim against Dr. Carter, because Plaintiff alleges no facts that show a causal nexus between Plaintiff's membership in the NAACP and the nonrenewal of her contract. (Defs.' Mem. at 4-8.) Specifically, Defendants argue that the fifteen-month time gap between when Dr. Carter learned of Plaintiff's NAACP membership (in February 2018) and the decision not to renew her contract (in May 2019) negates the inference of a causal nexus between the two events. (Defs.' Mem. at 7-8.) Moreover,

Defendants contend that Plaintiff has no good explanation for that temporal gap, and that her allegations of ongoing animus lack the requisite severity to excuse the absence of such an explanation. (Defs' Reply at 3-9.) In any event, Defendants argue that the praise that Plaintiff received from Dr. Carter in June and August of 2018 breaks the causal chain between the February 2018 comment and the May 2019 decision not to renew Plaintiff's contract. (Defs.' Reply at 5.) Finally, Defendants argue that they did not provide inconsistent reasons for Plaintiff's termination. (Defs.' Reply at 6.) According to Defendants, Dr. Carter's "different direction" statement and Plaintiff's alleged misconduct that the Board reported to the Virginia Employment Commission do not constitute mutually exclusive reasons for Plaintiff's termination. (Defs.' Reply at 6.)

Plaintiff concedes that the retaliation in this case did not closely follow the protected activity. (Pl.'s Resp. at 8.) Nonetheless, Plaintiff argues that she has offered a sufficient explanation for the delay — namely, that Dr. Carter demonstrated ongoing animus toward her during the intervening period, and that Defendants provided inconsistent reasons for her termination, which indicates pretext. (Pl.'s Resp. at 8.) To that end, Plaintiff argues that her Amended Complaint depicts a pattern of antagonism by Dr. Carter that adequately explains the temporal delay. Specifically, Plaintiff points to four actions that Dr. Carter took that Plaintiff argues evince a plausible inference of retaliatory animus sufficient to show causation: (1) Dr. Carter's decision to ostracize Plaintiff beginning in the Fall of 2018 (by, for example, no longer including in her meetings that she previously attended); (2) Dr. Carter asking Plaintiff's co-workers if they had any issues with Plaintiff in January 2019; (3) Dr. Carter's hiring of a new supervisor who immediately reprimanded Plaintiff on an unfounded allegation; and, (4) Dr. Carter's decision not to renew Plaintiff's contract before the completion of Plaintiff's improvement plan. (Pl.'s Resp. at 9.) The Court agrees with Plaintiff.

**\*5** To state a First Amendment retaliation claim under § 1983, Plaintiff—as a public employee — must show that: (1) she acted as a citizen, not as an employee, on a matter of public concern; (2) her interest in the expression at issue outweighed the employer's interest in providing effective and efficient services to the public; and, (3) there existed a sufficient causal nexus between the protected expression and the alleged adverse employment action. *Minnick v. County of Currituck*, 521 F. App'x 255, 262-63 (4th Cir. 2013) (citing *McVey v.*

*Stacy*, 157 F.3d 271, 277-78 (4th Cir. 1998)). As mentioned, Defendants agree that the third prong, causation, constitutes the dispositive issue for the Court to resolve. (Defs.' Reply at 1; Defs.' Mem. at 5 n. 2 ("For the purposes of this Motion only, the [Board] assumes that the Amended Complaint satisfies the first two elements of a First Amendment retaliation claim for a public employee [...].").

The causation analysis hinges on two inflection points — temporal proximity or, alternatively, a "sufficient explanation" for the delay between the protected activity and the alleged retaliation. *Reardon v. Herring*, 201 F. Supp. 3d 782, 785 (E.D. Va. 2016). Here, Plaintiff cannot rely on temporal proximity, because a period of approximately fifteen months separated the protected activity (Dr. Carter's awareness of Plaintiff's NAACP membership), and the adverse employment decision (Dr. Carter's decision not to renew Plaintiff's employment contract). *See Penley v. McDowell Cty. Bd. of Educ.*, 876 F.3d 646, 656-57 (4th Cir. 2017) (finding an eight-to nine-month gap between the protected activity and the adverse employment action too distant to raise an inference of causation). As such, Plaintiff must provide a sufficient explanation for that fifteen-month time gap.

"In cases where temporal proximity ... is missing, courts may look to the intervening period for other evidence of retaliatory animus." *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (internal quotations and citations omitted). "Specifically, evidence of recurring retaliatory animus [and conduct] during the intervening period can be sufficient to satisfy the element of causation." *Id.* (citations omitted). Additionally, courts will examine "inconsistent reasons for termination indicative of pretext" when evaluating whether a plaintiff has adequately bridged the temporal gap. *Carmack v. Virginia*, 2019 WL 1510333, at \*6 (W.D. Va. April 5, 2019); *Willis v. City of Virginia Beach*, 90 F. Supp. 3d 597, 612 (E.D. Va. 2015).

The Court finds that Plaintiff's allegations support the inference that a sufficient causal nexus existed between Dr. Carter's knowledge of Plaintiff's NAACP membership in February 2018 and the nonrenewal of Plaintiff's employment contract in May 2019. Plaintiff alleges, and the Court accepts as true, four discrete incidents of retaliatory animus that transpired during the relevant intervening period. First, Plaintiff alleges that at the beginning of the following school year, Dr. Carter began to ostracize Plaintiff by not

inviting her to meetings and by no longer speaking to her. (Am. Compl. ¶ 15.) Additionally, Plaintiff cites specific instances illustrative of retaliatory animus, such as when Dr. Carter solicited complaints about Plaintiff from her co-workers in January 2019, and when Plaintiff's newly appointed supervisor reprimanded Plaintiff based upon a false allegation. (Am. Compl. ¶ 16.) Finally, Plaintiff alleges that Defendants prescribed her a four-week improvement plan, but then decided to terminate her before she could even complete it. (Am. Compl. ¶ 18.) Plaintiff further alleges that Dr. Carter and the Board provided inconsistent explanations for terminating Plaintiff. (Am. Compl. ¶¶ 18-20.) Specifically, Dr. Carter suggested that Defendants were simply going in a "different direction" with the food service department, while the Board cited to specific incidents of alleged misconduct to justify its decision. (Am. Compl. ¶¶ 18-20.)

**\*6** Still, Defendants contend that Plaintiff cannot provide a valid reason to explain the temporal gap. (Defs.' Reply at 3-5.) Relying on the decision in *Reardon*, Defendants urge that a plaintiff can only rely on acts showing animus or antagonism to show causation when the conduct is "*coupled with* valid reasons why the adverse action was not taken immediately." (Defs.' Reply at 3.) (citing 🚩 *Reardon*, 201 F. Supp. 3d at 785). Likewise, Defendants argue that *Reardon* dictates that the alleged acts of animus here do not rise to the requisite level of severity necessary to excuse the temporal gap. (Defs.' Reply at 8-9.)

The Court finds Defendants' reliance on *Reardon* unavailing. In *Reardon*, the court analyzed three factual dynamics that allow a plaintiff to bridge the temporal gap and overcome the causation hurdle. 🚩 201 F. Supp. 3d 782, 785-88. Specifically, a plaintiff can show causation by alleging: (1) continuing (and severe) retaliatory conduct and animus; (2) regular acts of animus or antagonism coupled with valid reasons why the adverse action did not immediately follow the protected activity; or (3) that the employer took adverse action at the first convenient opportunity, even without a showing of animus. *Id.*

Here, Plaintiff's allegations arguably meet all three factual paradigms. Indeed, Plaintiff's allegations here are sufficiently severe to fall within the first category identified by this Court in *Reardon*. While the plaintiff in *Reardon* alleged that her supervisor subjected her to petty humiliations (e.g., by rarely talking to her, not giving her an earned window office, and not circulating congratulatory e-mails), Plaintiff here

alleges retaliatory conduct that affirmatively interfered with her ability to perform her job. 🚩 *Reardon*, 201 F. Supp. 3d at 788. For example, Plaintiff alleges continued professional ostracism and mistreatment, as well as the issuance of a written reprimand based on a false accusation. Accordingly, the retaliatory animus that Plaintiff alleges here far exceeds that alleged in *Reardon*. Additionally, as noted earlier, Plaintiff alleges that the nonrenewal of her contract in May 2019 represented the "very first opportunity" for Defendants to retaliate against her. (Am. Compl. ¶ 31.) Although the factual record may show otherwise once developed through discovery, the Court accepts that allegation at this stage of the litigation.

Finally, the Court agrees that Defendants provided inconsistent reasons for Plaintiff's termination, providing additional evidence of pretext. Indeed, Dr. Carter's neutral comment that Defendants were merely going in a "different direction" stands in stark contrast to the Board's official position vis-à-vis the Virginia Employment Commission that Plaintiff engaged in active workplace misconduct. Although Defendants' argument that these two statements "[are] not mutually exclusive" may ring true as a matter of strict logic, that argument simply fails on a motion to dismiss, when the Court must construe the facts in Plaintiff's favor.

Finally, the Court rejects Defendants' argument that Dr. Carter's praise in the summer of 2018 served to break the causal chain. Considering the consistent retaliatory animus otherwise alleged, coupled with Plaintiff's averment that not renewing her contract in May 2019 represented the first opportunity to truly retaliate against her, the Court finds that this fact may weigh in favor of Defendants at summary judgment, but it does not effect a complete break in the causal chain.

For these reasons, Plaintiff states a retaliation claim against Dr. Carter, and the Court will deny in part Defendants' Motion to Dismiss (ECF No. 11) as to Count II of Plaintiff's Amended Complaint.

## IV. CONCLUSION

**\*7** For the reasons set forth above, the Court hereby GRANTS IN PART and DENIES IN PART the Defendants' Motion to Dismiss (ECF No. 11), and DISMISSES WITH PREJUDICE Count II of Plaintiff's First Amended Complaint (ECF No. 9) to the extent it states a claim against the Board.

**McMillian v. King & Queen County School Board, Slip Copy (2020)**

2020 WL 5552118

**All Citations**

Slip Copy, 2020 WL 5552118

## Footnotes

1     As alleged in the First Amended Complaint, the meeting took place "approximately six months before the 2018-2019 school year." (Am. Compl. ¶ 11.) Plaintiff clarified in her Opposition to the Motion to Dismiss that the confrontation likely occurred during a break at the February 2018 budget meeting. (Mem. in Opp. to Def.'s Mot. to Dismiss ("Pl.'s Resp.") (ECF No. 17) at 8, n. 3.)

2     As discussed below, Plaintiff now agrees to dismiss Count II against the Board. (Pl.'s Resp. at 1, n. 1.)

3     Defendants' qualified immunity argument largely focused on whether Plaintiff's claim arose from speech-based retaliation. (Defs.' Mem. at 10-11.) Plaintiff has since clarified that her claim rests on free association — and not speech-based — retaliation, thus rendering Defendants' qualified immunity argument (to the extent it relied on the "clearly established" prong) moot. (Pl.'s Resp. at 7, n. 2.)

---

**End of Document**         © 2022 Thomson Reuters. No claim to original U.S. Government Works.